431 F.2d 1377
 Leon W. BRADLEY, Jr., a minor, by Leon W. Bradley, Sr., his father and next friend, et al., Plaintiffs-Appellants,
v.
BOARD OF PUBLIC INSTRUCTION OF PINELLAS COUNTY, FLORIDA, et al., Defendants-Appellees.
 No. 28639.
 United States Court of Appeals, Fifth Circuit.
 July 28, 1970.
 
 James B. Sanderlin, St. Petersburg, Fla., Jack Greenberg, William L. Robinson, Norman J. Chachkin, Drew S. Days, III, New York City, for plaintiffs-appellants.
 Edward A. Turville, St. Petersburg, Fla., for defendants-appellees.
 William C. Cramer, U. S. House of Rep., Washington, D. C., amicus curiae.
 Gerald Mager, Legal Counsel to the Governor, Tallahassee, Fla., for Claude R. Kirk, Jr., amicus curiae.
 ON PETITION FOR REHEARING
 Before SIMPSON, MORGAN and INGRAHAM, Circuit Judges.
 LEWIS R. MORGAN, Circuit Judge:
 
 
 1
 In the light of subsequent changes made by the school board in attendance zones and enrollment figures, and in order to incorporate into the Pinellas County school system new schools not shown in the original record, all as set out in the school board's motion for rehearing, the prior opinion and judgment of this court of July 1, 1970, are withdrawn and the following opinion and orders are substituted therefor.
 
 
 2
 The issue presented in this school desegregation case is whether the Pinellas County, Florida, public school system is unitary. The district court, by its final order of August 4, 1969, held that the desegregation plan submitted by the school board for the year 1969-1970 (hereinafter, the school board's plan) effectively "converted the old dual system to a unitary system in which racial discrimination is eliminated".[1] The school board's plan was put into effect for the 1969-70 school year even though plaintiffs appealed. From the district court's order, plaintiffs filed notice of appeal to this court on September 12, 1969. Upon oral argument and this court's request for additional findings of fact, the district court entered its supplemental findings on April 18, 1970.
 
 
 3
 Tested against the six criteria of Green v. New Kent County School Bd., 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968) — faculty, transportation, staff, facilities, extracurricular activities, and student body composition — and the end to be achieved as set out in Alexander v. Holmes County Board of Education, 396 U.S. 19, 90 S.Ct. 29, 24 L.Ed.2d 19 (1969) — that the school system no longer operate as a dual system based on race or color but as a "unitary school system within which no person is to be effectively excluded from any school because of race or color" — we find the school board's plan, as approved by the district court, to be deficient in student assignment in certain schools. In keeping with the approach of Ellis v. Board of Public Instruction of Orange County, Florida, 5 Cir., 1970, 423 F.2d 203; Mannings v. Board of Public Instruction of Hillsborough County, Florida, 5 Cir., 1970, 427 F.2d 874; and Davis v. Board of School Commissioners of Mobile County, 5 Cir., 1970, 430 F.2d 883; we will review all the requisites of Green, supra, to make a final determination as to whether Pinellas County has been effectively converted into a unitary system.
 
 
 4
 The Pinellas school system covers the whole of Pinellas County with a land area of 265 square miles. The student population of the system is approximately 80,000, of which 12,700, or 16%, are Negro students. Approximately 9,500 of these Negro students live in the City of St. Petersburg, in the southernmost part of the system.
 
 
 5
 Since 1964, when the original complaint in this case was filed up to the 1969-70 school year, there has been a gradual decrease in the percentage of students in all-Negro schools throughout the entire system. In the 1969-70 school year, there were 102 schools in operation — 72 elementary, 19 junior high, and 11 senior high schools. During the 1969-70 school year, 12 elementary schools, one junior high and one senior high school served all-Negro or virtually all-Negro student bodies. Approximately 8,400, or 66%, of the 12,700 Negro students in the entire system at all levels attended all-Negro or virtually all-Negro schools.
 
 
 6
 Under the school board's plan, the plan approved by the district court, there were to be 107 schools in operation — 75 elementary, 20 junior high, and 12 senior high schools. At the elementary level, nine would remain all-Negro or virtually all-Negro. There would also remain the one all-Negro junior high and one all-Negro senior high school. Under this plan, 8,200 out of the 12,700 Negro students in the entire system at all grade levels, or 64%, would attend all-Negro or virtually all-Negro schools.
 
 
 7
 The school board's plan does not change the already-existing majority-to-minority transfer policy, which during the 1969-70 school year has resulted in the transfer of only 62 students.[2] The plan also leaves intact two bi-racial committees operating in Pinellas County. We do not disapprove of either of these two features of the school board's plan.
 
 FACULTY AND STAFF
 
 8
 The faculty and staff desegregation standard enunciated in Singleton v. Jackson Municipal Separate School District, 5 Cir., 1969, 419 F.2d 1211, requires assignment on a basis whereunder the ratio of Negro to white teachers and staff members in each school is substantially the same as each such ratio is to teachers and staff in the entire school system. This standard has been met in the Pinellas County school system. According to the school board's "Instructional Personnel Assignments" submitted to this court and dated July 15, 1970, each school system has a faculty composition which closely approximates the 87.5%-white — 12.5%-Negro ratio in compliance with Singleton. The Board is ordered to implement this faculty and staff assignment for its 1970-71 school year.
 
 
 9
 TRANSPORTATION, FACILITIES, AND EXTRACURRICULAR ACTIVITIES
 
 
 10
 From the record, it appears that the Pinellas County transportation system is operated on a desegregated basis. The district court, through its approval of the school board's Exhibits D-1, D-2, and D-3, found that the transportation is equally available to both Negro and white students in Pinellas County.
 
 
 11
 The facts indicate that the extracurricular activities and facilities of the Pinellas County schools are also operated on a desegregated basis. There is no complaint regarding transportation, extracurricular activities or facilities.
 
 
 12
 The district court is directed to enter an order requiring the continued desegregation of facilities and extracurricular activities and to include the requirements of Singleton v. Jackson, supra, as to transportation, school construction, and school site selection as a part of the order.
 
 STUDENT ASSIGNMENT
 
 13
 We have examined the board's proposed plan, and, on our own initiative, have considered various means of modifying the plan so as to eliminate all-Negro or virtually all-Negro student bodies while at the same time maintaining the neighborhood school concept of the school system. The Pinellas school board does not purport to use the strict neighborhood assignment system that was applicable in Ellis, supra, but rather employs attendance zones based on discretionary zone lines. We find that the situation can be greatly improved by pairing some schools located in close proximity to each other, as was done in Mannings, supra, by redrawing the zone lines in several instances, and by grouping several schools into a common attendance zone.
 
 
 14
 In the following pages of this opinion, we undertake to set out the modifications of the school board's plan which will be necessary to achieve an assignment of students commensurate with a unitary system. The modifications reduce the number of all-Negro or virtually all-Negro elementary schools from nine, as contemplated by the district court-approved board's plan, to three. The modification will desegregate all junior and senior high schools in the system. Instead of 64% of the Negro students being assigned to all-Negro schools, as would be the case under the school board's plan, the result under our modifications will be 14.2% (1,738 students instead of 8,700). Every Negro child will attend an integrated school at some time during his educational career.
 
 
 15
 Attached as Appendix A is a chart depicting student body composition by school and race under the district court-approved board plan and the plan as modified by this court. The district court is directed to implement the board's plan as herein modified before August 14, 1970.
 
 
 16
 The majority of the Negro population in the Pinellas school system is situated in a densely populated 40-square block area in the middle of St. Petersburg. Nine of the 11 schools which would remain all-Negro or virtually all-Negro under the board's plan are located within this area-seven elementary, one junior high, and one senior high. Together, these nine schools enrolled 7,019, or 58% of the entire Negro student population in the school system, during the 1969-70 school year.
 
 
 17
 The other two all-Negro or virtually all-Negro schools remaining under the board's plan are located in the urban area of the City of Clearwater in the northern sector of Pinellas County. Both are elementary.[3]
 
 
 18
 As for the two all-Negro schools in Clearwater, the board has paired Palmetto Elementary (formerly 331 Negroes, 0 white) with Kings Highway (formerly 0 Negro, 718 whites), which schools have contiguous attendance zones and are less than one mile apart. Such a pairing has resulted in an enrollment in the schools of 260 Negroes, 650 whites as of the end of the 1969-70 school year. In light of these facts, we find that Palmetto has been effectively desegregated under this pairing plan.
 
 
 19
 The remaining all-Negro school in the Clearwater area is Curtis Elementary (362 Negroes, 0 white). The board's earlier attempt to desegregate this school by extending its attendance zone lines northward into the Dunedin attendance zone has not effectively achieved this goal. There being no alternatives submitted by the parties, Curtis is ordered to be paired with Dunedin Elementary (31 Negroes, 849 whites) which is approximately two miles to the north. The relative capacities of the schools could be best utilized by housing in Curtis the fifth and sixth grades from both schools and in Dunedin the first through the fourth grades from both schools, though the ultimate grade levels and student assignments are to be made by the board. The resulting racial composition in the paired zone is 329 Negroes and 868 whites.
 
 
 20
 Turning to the nine schools in St. Petersburg which would remain all-Negro or virtually all-Negro under the school board's plan, the district court found that as to these schools "no feasible plan" of desegregation was shown other than the school board's plan. On remand for supplemental findings, the district court found that no additional white students would be assigned to these nine schools if the attendance zone lines were changed so that a neighborhood school attendance policy (as set out in Ellis, supra) were followed.
 
 
 21
 We find that the all-Negro or virtually all-Negro junior high school and senior high school in St. Petersburg, as well as four of the seven elementary schools which would remain all-Negro or virtually all-Negro under the board's plan, can be desegregated through pairing, grouping, and relocating of zone lines without creating impractical attendance zones or inordinate transportation problems. In setting out our modifications below for the schools in St. Petersburg, we refer to the zone lines and attendance figures projected by the board for the 1970-71 school year. These lines slightly modify the 1969-70 attendance zone lines in that a small number of Negroes are zoned out of the 40-square-block area and into adjacent zones. However, the seven elementary, the junior high and the senior high schools remain all- or virtually all-Negro. We, therefore, ORDER implementation of the following modifications of these projected zones for the 1970-71 school year.
 
 Elementary Schools
 
 22
 Glenoak Elementary (490 Negroes, 7 whites) is bounded on the south by two predominantly white elementary schools — Lakewood Elementary (77 Negroes, 431 whites) and, further south, Bay Vista (7 Negroes, 482 whites) — which are one and one-half miles and two and one-half miles, respectively, by road from Glenoak. It is ordered that Glenoak Elementary be desegregated by implementing either of the following alternative plans:
 
 
 23
 (1) By pairing Glenoak and Lakewood, resulting in a racial composition in the new school zone of 567 Negroes and 438 whites, or
 
 
 24
 (2) By grouping Glenoak, Lakewood and Bay Vista, resulting in a racial composition in the one zone in which these three schools are placed of 574 Negroes and 920 whites.
 
 
 25
 Under either alternative, the school facilities are to be employed in such a manner that will best utilize the schools' capacities and as will prove, in the opinion of the board, to be most educationally sound.
 
 
 26
 Lakeview Elementary (704 Negroes, 4 whites) is bordered on the south by a new school, Maximo Elementary (78 Negroes, 552 whites), and one mile further south is Bay Point Elementary (3 Negroes, 452 whites). Maximo and Bay Point are two and three miles, respectively, from Lakeview. It is ordered that Lakeview Elementary be desegregated by implementing either of the following alternative plans:
 
 
 27
 (1) By pairing Lakeview and Maximo, resulting in a racial composition in the new school zone of 782 Negroes and 556 whites, or
 
 
 28
 (2) By grouping Lakeview, Maximo and Bay Point, resulting in a racial composition in the one zone in which the three schools are placed of 785 Negroes and 1,008 whites.
 
 
 29
 Again, the manner in which the grade levels and enrollment figures are to be allotted in each school under either alternative must best utilize the schools' capacities and prove, in the opinion of the board, to be most educationally sound.
 
 
 30
 Wildwood Elementary (752 Negroes, 1 white) is in the northwestern part of the 40-square-block area. It is ordered that this school be desegregated in the following manner: The Forest Hills zone line is to be extended into the southeast corner of the Bear Creek zone so as to pick up 50 white elementary students and bring that school down to its capacity. The western zone line of the Fairmount Park zone is to be moved westward in to the Forest Hills zone so as to pick up 100 white elementary students, bringing both Forest Hills and Fairmount Park (with one relocatable placed on the Fairmount Park site) close to their relative capacities. The West Central zone line is to be extended into the southeastern corner of the Mt. Vernon zone so as to take into the West Central zone 100 white elementary students which it can accommodate by placing two relocatables on the West Central site. These zone lines having been thus redrawn, the three schools, Fairmount Park (66 Negroes, 282 whites), West Central (147 Negroes, 432 whites), and Wildwood (752 Negroes, 1 white), all of which have contiguous attendance zones and are approximately one and one-half miles equi-distant from each other, are ordered to be grouped, with the grade levels and enrollments in each of the three schools to be allotted in the same manner described in the two preceding paragraphs. The racial composition resulting from such a grouping is 965 Negroes and 715 whites.
 
 
 31
 Campbell Park (701 Negroes, 0 white) is in the northeastern section of the 40-square-block area, and is bordered on all sides by desegregated schools — West Central (147 Negroes, 432 whites), Euclid (180 Negroes, 53 whites), and Roser Park (165 Negroes, 141 whites) — or all-Negro schools Jordan and Melrose to the southwest. However, approximately one mile further north, there are four all-white schools. Campbell Park is ordered to be desegregated in the following manner: The zone lines of Woodlawn are to be extended into the Norwood attendance zone so as to pick up 100 white elementary students. The easternmost part of the Woodlawn zone, east of Ninth Street N., is to be zoned into the Euclid zone (approximately 50 or more white elementary students). The Euclid zone is then to be extended further north into the southern part of the North Shore zone to pick up another 50 white elementary students. While this rezoning leaves Norwood and North Shore short of capacity (42 and 85 students, respectively), it brings both Woodlawn and Euclid — both formerly under-capacity — to full capacity. The zone lines of North Ward Elementary are to be extended northward into the southern part of the North Shore zone so as to pick up 50 white elementary students, bringing North Shore below capacity and requiring full capacity at North Ward, with two relocatables being situated on that site. Having thus redrawn these zone lines, the four schools, Woodlawn (4 Negroes, 320 whites), Euclid (180 Negroes, 153 whites), North Ward (2 Negroes, 348 whites), and Campbell Park (701 Negroes, 0 white), are ordered to be grouped with the grade levels and enrollments in each school to be allotted by the school board in the same manner as set forth in the preceding paragraphs. The fourth through the sixth grades in the four zones could be housed in Campbell Park and Euclid, while the first through the third grades could be housed in Woodlawn and North Ward, though such allocation is only one of many ways in which the school board could effectuate this grouping. Such a grouping would involve no more distant traveling than two and one-half miles (the greatest distance among the schools being only two miles) and would result in a racial composition in the one zone in which the four schools are placed of 887 Negroes and 821 whites.
 
 
 32
 The district court is directed to incorporate any other additional elementary facilities which have heretofore not been in operation into the system on a desegregated basis and as will be consistent with the above modifications.
 
 Junior High Schools
 
 33
 The board plan leaves one all-Negro junior high school, Sixteenth Street Junior High (1,573 Negroes, 0 white). Its attendance zone lines are nearly co-extensive with the 40-square-block Negro concentration in St. Petersburg. Of the four contiguous junior high school attendance zones, that of Disston to the west is the zone in which the school itself is closest to Sixteenth Street School. Disston Junior High (29 Negroes, 971 whites) is approximately three miles from Sixteenth Street Junior High. All of the other contiguous junior high attendance zones are more expansive and the junior high schools therein are more distant.
 
 
 34
 Having considered the capacities of the schools, the distances to be traveled, and the alternatives involving the other junior high schools in St. Petersburg, Disston Junior High is ORDERED to be paired with Sixteenth Street Junior High within their present 1969-70 attendance zones.[4] The resulting proportion of Negroes to whites in the new zone would be 1,602 Negroes and 971 whites.
 
 Senior High Schools
 
 35
 Likewise, one senior high school, Gibbs Senior High School (992 Negroes, 1 white) would remain all-Negro under the board plan. Its attendance zone boundaries are exactly co-extensive with the 40-square-block area, and all three contiguous senior high school attendance zones extend outward covering more than twice the area of the Gibbs zone. Two of the three contiguous zones have the high schools situated in relatively close proximity to Gibbs — St. Petersburg Senior High (128 Negroes, 1,082 whites) being one and one-half miles away, and Boca Ciega Senior High (65 Negroes, 1,873 whites) being two miles distant. Desegregation of Gibbs must be accomplished by either of the two following methods:
 
 
 36
 (1) Extend the zone lines of the Boca Ciega attendance zone into the southwestern section of the Gibbs zone so as to incorporate 200 Negroes into the Boca Ciega zone. Then draw a new zone line running north to south between Gibbs Senior High and St. Petersburg Senior High so as to divide the remaining 800 Negroes in the Gibbs zone and the 1,082 whites in the St. Petersburg High zone equally between St. Petersburg Senior High and Gibbs Senior High. The resulting proportion of Negro to white in these three redrawn zones would be: Boca Ciega — 265 Negroes, 1,873 whites (the additional 200 Negroes in the Boca Ciega facility would still leave that facility short of capacity); St. Petersburg — 528 Negroes, 541 whites; Gibbs — 400 Negroes, 541 whites.
 
 
 37
 (2) An alternative for the desegregation of Gibbs Senior High is to close the present Gibbs facility and redraw the zone lines of the three contiguous high school zones so as to incorporate in equal numbers the Negro students in the present Gibbs zone. The district court is ordered to give consideration to the views of the school board and the advice given the school board by the bi-racial committees as to the choice between the alternatives. The school facilities in the three contiguous high school zones are large and would not be strained by the influx of the additional 330 Negro students.
 
 
 38
 In conclusion, we feel that the modifications herein ordered to be implemented before the September Term of the 1970-71 school year effectively convert the Pinellas County student body composition into a unitary school system. It is noted that these modifications, while leaving three all-Negro elementary schools in the center of St. Petersburg, reduce from 64% to 14.2% the percentage of Negroes attending all-Negro schools, and all these Negroes will later attend desegregated junior high and senior high schools.
 
 
 39
 The district court is further directed to order that a bi-racial committee similar in function to that established in Ellis, supra, be implemented and that the majority to minority transfer policy be made available to all students. See 430 F.2d pages 888-889 of Davis, supra, as to the operational correlation between these two features of the school plan for the 1970-71 school year.
 
 DEFICIENCIES TO BE REMEDIED
 
 40
 We conclude that only one of the six elements which go to make up a unitary school system is deficient — student body composition. This deficiency must be remedied not later than August 14, 1970, as heretofore set out.
 
 
 41
 Once the orders and directions have been effectuated in accordance with the standards heretofore set forth, the district court must retain jurisdiction for a reasonable time to insure that the system is operated in a constitutional manner. As the Supreme Court stated in Green, supra, "* * * whatever plan is adopted will require evaluation in practice, and the court should retain jurisdiction until it is clear that the state-imposed segregation has been completely removed". 391 U.S. 439, 88 S.Ct. 1695.
 
 
 42
 This court, having modified the opinion of July 1, 1970, subject to such modifications, the appellees' petition for rehearing is denied.
 
 
 43
 APPENDIX "A"
 Projected Student
 Projected Student Enrollment Under
 Enrollment Modifications
 Under Board's Ordered by this
 Proposed Plan Court

School Negroes Whites Negroes Whites
Elementary
Anona Elem. 120 520 120 520
Azalea Elem. 0 831 0 831
Bay Point Elem. 1 724 See Opinion
Bay Vista Elem. 0 725 See Opinion
Bear Creek 0 370 1 354
Belcher Elem. 1 779 1 779
Belleair 70 680 70 680
Blanton 0 610 0 610
Campbell Park 730 0 See Opinion
Childs Park 200 190 200 190
Clearview Ave. 0 568 0 568
Cross Bayou 0 580 0 580
Curtis Elem. 325 0 329 868
Dunedin Elem. 37 792 Paired with
 Curits Elem.
Euclid 180 53 See Opinion
Fairmount Park 70 195 See Opinion
Fifty-Fourth Ave. 0 643 0 643
Forest Hills 0 224 1 161
Fuguitt 0 740 92 595
Glenoak 356 4 See Opinion
Gulf Beaches 0 377 0 377
Gulfport 6 504 6 504
Harris Elem. 0 194 0 194
High Point Elem. 0 605 0 605
Jordan Elem. 463 0 487 0
Kings Highway 0 760 Paired with
 Palmetto
Lakeview 1,090 6 See Opinion
Lakewood See Opinion
Largo Central 1 659 81 478
Lealman Ave. 0 487 0 487
Lincoln Heights 0 0 0 0
Lynch Elem. 0 934 0 934
Madeira Beach Elem 0 553 0 553
Maximo 78 552 See Opinion
Melrose 644 0 636 0
Mildred Helms 0 850 116 681
Mt. Vernon 0 445 0 364
North Shore 0 570 0 449
North Ward-Clw. 170 280 170 280
North Ward-S.P. 14 306 See Opinion
Northwest 0 385 0 385
Norwood 0 292 0 233
Oakhurst 0 900 133 787
Oldsmar 8 317 8 317
Orange Grove 0 370 0 370
Ozona 0 205 0 205
Palm Harbor 0 225 0 225
Palmetto 331 0 260 650
Pasadena 0 500 0 500
Perkins 694 0 615 0
Pinellas Park 0 708 0 708
Plumb 0 675 0 675
Ponce de Leon 0 775 0 775
Ridgecrest 380 0 64 416
Rio Vista 0 481 0 481
Roser Park 150 107 150 107
Safety Harbor Elem. 97 422 229 729
San Jose 20 714 20 714
Seminole Elem. 1 639 1 639
Seventy-Fourth St. 0 520 0 520
Shore Acres 0 651 0 651
Skycrest 64 535 64 535
Skyview 0 700 0 700
South Ward 45 515 45 515
Starkey 0 950 0 950
Sunset Hills 32 290 90 322
Sunshine 0 205 0 205
Tarpon Springs 60 574 154 620
Tyrone Elem. 0 680 0 680
Union Academy 139 0 0 0
West Central 215 357 See Opinion
Westgate 0 714 0 714
Wildwood 836 0 See Opinion
Woodlawn 31 269 See Opinion
Elementary "A" 68 585 68 585
Elementary "D" 0 652 0 652
Junior High
Azalea Jr. 0 1275 0 1275
Bay Point 0 950 0 950
Clw. Comprehensive 100 250 100 250
Disston Jr. 20 980 Paired with
 Sixteenth St.
Dunedin Jr. 150 1016 150 1016
Kennedy Jr. 219 1081 219 1081
Largo Jr. 200 1400 200 1400
Lealman Jr. 0 875 0 875
Madeira Beach Jr. 1 1015 1 1015
Meadowlawn Jr. 77 1173 77 1173
Oak Grove Jr. 0 1350 0 1350
Palm Harbor Jr. 0 217 0 217
Pinellas Park Jr. 0 1450 0 1450
Riviera Jr. 0 1310 0 1310
Safety Harbor Jr. 70 468 70 468
Seminole Jr. 110 890 110 890
Sixteenth St. Jr. 1600 0 1602 971
 
 
 44
 Southside Jr. 475 225 475 225
Tarpon Springs Jr. 145 455 145 455
Tyrone Jr. 0 1205 0 1205
Senior High
Boca Ciega Sr. 162 2228 265** 1873
Clearwater Sr. 150 2150 150 2150
Dixie Hollins Sr. 15 2385 15 2385
Dunedin Sr. 175 1325 175 1325
Gibbs Sr. 1075 38 400** 541
Lakewood Sr. 201 1149 124** 1136
Largo Sr. 125 1750 125 1750
Northeast Sr. 0 2200 0 2200
St. Petersburg Sr. 160 1064 528** 541
Seminole Sr. 1 1524 1 1524
Tarpon Springs Sr. 75 635 75 635
 
 
 
 Notes:
 
 
 **
 The figures given are the results achieved if the first alternative for senior high schools is adopted. Figures resulting if the second alternative is adopted are:
 N W
Boca Ciega 395 1873
Gibbs 0 0
Lakewood 509 955
St. Petersburg 458 1082
 Notes:
 
 
 [1]
 The school board's plan has been revised and amended throughout the course of litigation. The figures used below are based on school population by race as of April 23, 1970
 
 
 [2]
 Fifty of these students, however, were Negroes transferring from all-Negro to predominantly white schools
 
 
 [3]
 We find that the board's plan for converting Union Academy into a special education center and distributing its Negro student body between Sunset Hills and Tarpon Springs and for implementing a similar plan for Lincoln Heights, and for reassignment of students to desegregate Ridgecrest all are effective in desegregating the three formerly all-Negro schools in the upper part of Pinellas County
 
 
 [4]
 Since the capacity of Sixteenth Street Junior High is twice that of Disston Junior High, a feasible pairing plan would assign one of the three grades of these "middle schools" to Disston, and assign the other two grades to Sixteenth Street