432 F.2d 362
 Frederick ALLEN and Timothy Allen, minors, etc., et al.,
Plaintiffs-Appellants-Cross Appellees,
v.
BOARD OF PUBLIC INSTRUCTION OF BROWARD COUNTY, FLORIDA,
etc., et al., Defendants-Appellees, Blanche Ely High School
Parent Teachers Association andIrene S. Clarke,
Defendants-Appellees-Cross Appellants.
 No. 30032.
 United States Court of Appeals, Fifth Circuit.
 Aug. 18, 1970, Rehearing Denied and Rehearing En Banc Denied
Sept. 24, 1970.
 
 W. George Allen, Fort Lauderdale, Fla., Jack Greenberg, Norman J. Chachkin, Drew S. Days, III., New York City, N.Y., for plaintiffs-appellants.
 Thomas A. Thomas, Hollywood, Fla., Arthur S. Seppi, Fort Lauderdale, Fla., for other interested parties.
 W. M. O'Bryan, Fleming, O'Bryan & Fleming, Mendez, Shaw, Marko & Stephany, Fort Lauderdale, Fla., for defendants-appellees.
 John R. Young, Hamilton, James, Merkle & Young, West Palm Beach, Fla., for cross-appellants Blanche Ely Parent Teachers Assn. and Irene S. Clark.
 Before GEWIN, GOLDBERG and DYER, Circuit Judges.
 GOLDBERG, Circuit Judge:
 
 
 1
 We consider here the plan of desegregation ordered for Broward County, Florida, by the district court.[1] The Broward County School System is a county-wide system serving a largely urban and rapidly growing area of the Florida 'Gold Coast.' During the 1969-70 school year the Board of Public Instruction of Broward County operated 115 schools to educate more than 112,000 students, approximately 77 percent white and 23 percent black. Under the Board's projections for the 1970-71 school year, 116 schools will educate more than 118,000 students, approximately 78 percent white and 22 percent black. A substantial percentage of the students in the Broward County system are transported to and from school by bus.
 
 
 2
 The present desegregation suit was filed by Negro plaintiffs on January 9, 1970. The first hearing to consider this action was held on January 16, 1970. As a result of facts adduced at that hearing the district court found that the Board was operating a dual school system. The Board was ordered to file by February 16, 1970, 'a comprehensive plan to establish a unitary school system' in Broward County. The court suggested that the Board, in formulating its plan, consult with the Florida School Desegregation Consulting Center at the University of Miami.
 
 
 3
 A plan was duly submitted, objections were filed with the court, and a hearing was held on March 3, 1970. At that hearing the court expressed the view that it needed more information to measure the plan against constitutional standards. The Board was directed to 'consult and cooperate with and accept the aid of' the Florida School Desegregation Consulting Center in revising its plan 'with special emphasis on eliminating the remaining all-black elementary schools.' The Center was requested to make a report with recommendations 'designed to assure a desegregation plan which meets the constitutional standard of a unitary system.'
 
 
 4
 Pursuant to the court's directives, the Board filed an amended plan and the Center submitted its recommendations. The principal difference between the two proposals was in their approach to the problem of desegregating all-black and overwhelmingly black elementary schools. The Center suggested use of school pairing as a means of desegregating these elementary schools, but the Board's plan rejected pairing. The plan submitted by the Board merely amended some of the discretionary zone lines which had previously been proposed.
 
 
 5
 The court held a hearing on April 3, 1970, to consider the Board plan and the Center's proposal. At that hearing the court heard the views of the Board, the Center, the plaintiffs, and various parties who had been allowed to intervene. On April 30, 1970, the court entered its final order. With regard to the hotly disputed issue of student desegregation in the elementary schools, the court's order rejected the Center's approach and accepted the boundaries of school attendance zones as proposed in the Board's amended plan. From that order plaintiffs have perfected this appeal. An appeal has also been taken by intervenors Blanche Ely High School Parent Teachers Association and Irene S. Clark.
 
 THE DISTRICT COURT'S ORDER
 
 6
 With respect to faculty, staff, transportation, extracurricular activities, and facilities, the desegregation order entered by the district court on April 30, 1970, is unexceptional and is not challenged by any of the parties. Except for the problem noted in the next paragraph of this opinion, the order is in compliance with all of our Singleton[2] requirements, including the requirement that faculty and staff members be assigned in such a manner that the ratio of whites to blacks in each school is substantially the same as the ratio of whites to blacks in the entire system.[3] The order further provides for a bi-racial committee of twelve members-- six blacks and six whites-- to be appointed by the court to make recommendations to the Board with respect to such matters as 'the operation of (the) majority to minority pupil transfer rule, the transportation system, and selection of school sites.' The record indicates that this committee has been appointed, and it is apparently functioning now.
 
 
 7
 Although the parties have not put it in issue, we note one deficiency in the district court's order. This deficiency has to do with the majority-to-minority transfer provision. The order approves the following transfer rule:
 
 
 8
 1. Any pupil, with parental consent, shall have the right to transfer from a school at which his race is in the majority to the next nearest school at which his race is in the minority and the board shall furnish free transportation provided the distance involved meets state transportation statutes.
 
 
 9
 2. Other reassignment requests will be considered providing the request does not involve the transfer of a pupil (from a school) in which his race is in the minority to a school in which his race is in the majority.
 
 
 10
 This provision is not entirely in accord with our recent decisions. See Hightower v. West, 5 Cir. 1970, 430 F.2d 552; Carr v. Montgomery County Board of Education, 5 Cir. 1970, 429 F.2d 382; Davis v. Board of School Commissioners of Mobile County, 5 Cir. 1970, 430 F.2d 883; Singleton v. Jackson Municipal Separate School District, 5 Cir. 1970, 426 F.2d 1364. On remand the district court's order must be modified to make it clear that (1) any pupil shall have the right to transfer from a school at which his race is in the majority to any school (not just the next nearest school) at which his race is in the minority and (2) transferees shall be given priority for space.[4]
 
 STUDENT DESEGREGATION: SECONDARY SCHOOLS
 
 11
 Student assignment to secondary schools-- high schools, junior high schools, and middle schools-- presents no problem on this appeal. The plaintiffs are not unhappy with the court-approved plan insofar as it relates to pupil assignment to secondary schools, and our examination of this aspect of the plan does not disclose any deficiencies to be remedied.
 
 
 12
 The intervenors, however, raise an issue with regard to the closing of Blanche Ely High School. Blanche Ely, located in a black neighborhood in Pompano Beach, has been a junior-senior high school. During the 1969-70 school year its student enrollment was 100 percent black. For the 1970-71 school year the court approved the Board's proposal to close the school as a high school facility, send its students elsewhere, and use the building to house the Coleman Elementary School. Intervenors object to the closing of Blanche Ely High School, arguing (1) that the community which has been served by the school will suffer if the school ceases to exist and (2) that the district court was erroneous in finding that the Blanche Ely physical plant is not an adequate secondary school facility.
 
 
 13
 We are not persuaded that we should order the district court to require the reopening of Blanche Ely as a high school. There is nothing in the record to indicate that the Board's decision to close Blanche Ely was based on anything other than sound educational criteria. Moreover, the record amply supports the district court's finding that the Blanche Ely facility is not an adequate physical facility for conducting a high school program. In the light of these factors we find no merit in the intervenors' objection to the closing of the school.
 
 STUDENT DESEGREGATION: ELEMENTARY SCHOOLS
 
 14
 The real bone of contention in this case is student assignment at the elementary school level. As we have noted, the Florida School Desegregation Consulting Center, whose recommendations were generally endorsed by the plaintiffs, recommended the use of the pairing/clustering technique to desegregate all-black and virtually all-black schools, but the school board strongly opposed the use of this technique at the elementary level. The district court agreed with the Board's position vis-a-vis pairing, requiring only that the Board redraw some of its discretionary zone lines. The results achieved under the amended zoning plan approved by the district court are decidedly unimpressive. Of the 83 elementary schools projected for the 1970-71 school year, 13 are to have an enrollment that is 90 percent or more black. The projected student enrollment for these schools is as follows:
 
 
 15
 Percentage
School and Location Black White Total Black
Carver Ranches
 (in South Area) 663 37 700 95%
C. A. Moore
 (in South Area) 598 0 598 100%
Broward Estates
 (in Central Area) 779 78 857 91%
Dillard
 (in Central Area) 982 3 985 99%
Larkdale
 (in Central Area) 1054 0 1054 100%
Lincoln Park
 (in Central Area) 892 0 892 100%
Rock Island
 (in Central Area) 642 50 692 93%
Sabal Palm
 (in Central Area) 632 25 657 96%
Walker
 (in Central Area) 733 0 733 100%
Charles Drew
 (in North Area) 1014 17 1031 98%
Coleman
 (in North Area) 601 25 626 96%
Markham
 (in North Area) 536 60 596 90%
Sanders Park
 (in North Area) 666 48 714 93%
 
 
 16
 The black students to be assigned to these 13 schools constitute 68 percent of the total number of black elementary students in Broward County. The plaintiffs contend that the existence of these all-black and virtually all-black elementary schools in Broward County is unacceptable. We agree.
 
 
 17
 The reason for the existence of so many all-black and virtually all-black elementary schools under the court-approved plan is clear from an examination of the record: the trial judge achieved as much desegregation of formerly black elementary schools as he thought practicable by the redrawing of discretionary zone lines, but he refused to pair or cluster any elementary schools.[5] In the factual situation here presented we think the trial court's rejection of the pairing technique must be reversed.
 
 
 18
 In the conversion from dual school systems based on race to unitary school systems, the continued existence of all-black or virtually all-black schools is unacceptable where reasonable alternatives exist. And it is clear that one acceptable way to achieve reasonable alternatives is by pairing schools. The tenor of our decisions is unmistakable: where all-black or virtually all-black schools remain under a zoning plan, but it is practicable to desegregate some or all of the black schools by using the tool of pairing, the tool must be used. Thus we have required the pairing or clustering of schools in Dade County, Florida,[6] in Pinellas County, Florida,[7] in Hillsborough County, Florida,[8] in Alachua County, Florida,[9] in Clarksdale, Mississippi,[10] and in Jackson Mississippi,[11] to mention only a few instances. It is now clear beyond peradventure that the tool of school pairing-- a most viable tool in the school desegregation process-- must be embraced where it is practicable and desegregation cannot be achieved by other means.
 
 
 19
 The Supreme Court has told us that 'there is no universal answer to complex problems of desegregation; there is obviously no one plan that will do the job in every case. The matter must be assessed in light of the circumstances present and the options available in each instance.' Green v. New Kent County School Board 1968, 391 U.S. 430, 439, 88 S.Ct. 1689, 20 L.Ed.2d 716. There are indeed many roads to Rome, and the pairing road must not be avoided like the plague simply because it presents some problems to the school board and the community. We are not insensitive to the abrasions and dislocations that can sometimes be caused by the paring technique-- and in every case the courts must strive to keep such problems to a minimum-- but the pairing technique cannot be totally eschewed because it is not perfect. The Supreme Court has commanded courts and school boards to eliminate school segregation 'root and branch,' Green, supra, 391 U.S. at 438, 88 S.Ct. 1689, and to do it now. See Green, supra; Alexander v. Holmes County Board of Education, 1969, 396 U.S. 19, 90 S.Ct. 29, 24 L.Ed.2d 19; Carter v. West Feliciana Parish School Board, 1970, 396 U.S. 290, 90 S.Ct. 608, 24 L.Ed.2d 477. We must be responsive to this constitutional mandate.
 
 
 20
 Our examination of the record before us indicates that the pairing/clustering technique can be utilized to desegregate every one of the 13 all-black or virtually all-black elementary schools envisioned in the plan approved by the district court. This desegregation can be accomplished 'without creating impractical attendance zones or inordinate transportation problems.' Bradley v. Board of Public Instruction of Pinellas County, 5 Cir. 1970, 431 F.2d 1377 (July 28, 1970). Accordingly, we hereby order the following modifications in the district court's desegregation order for the 1970-71 school year.
 
 South Area
 
 21
 The area designated by the school board as the South Area includes two all-black or virtually all-black schools, Carver Ranches and C. A. Moore. These schools present an obvious opportunity for application of the pairing/clustering technique, for both the Carver Ranches zone and the Moore zone are surrounded by predominantly white school zones. The district court shall order the following groupings:
 
 
 22
 (1) Carver Ranches, Orange Brook, Watkins, and Lake Forest
 
 
 23
 (2) Moore, Colbert, Hollywood Central, and Hallendale
 
 
 24
 The projected student enrollments in the attendance zones created by these groupings are set out in the Appendix to this opinion.
 
 Central Area
 
 25
 The Central Area contains a core area of black population concentration in which seven elementary schools are more than 90 percent black, including three schools that are 100 percent black and one that is 99.6 percent black. The seven schools are Larkdale, Broward Estates, Sabal Palm, Lincoln Park, Walker, Dillard, and Rock Island. Our study of this area indicates that it is practicable to effectively desegregate every one of these seven schools by use of the pairing/clustering technique. The district court shall order the following groupings:
 
 
 26
 (1) Larkdale, Lauderhill and Castle Hill
 
 
 27
 (2) Broward Estates, Plantation, and Pine Ridge
 
 
 28
 (3) Sabal Palm, Westwood Heights, and Sunset
 
 
 29
 (4) Lincoln Park, North Fork, Hortt, and Riverland
 
 
 30
 (5) Walker, North Side, and East Side
 
 
 31
 (6) Dillard, Lauderdale Manors, and Wilton Manors
 
 
 32
 (7) Rock Island, Oriole, and Lloyd Estates
 
 
 33
 The projected student enrollments in the attendance zones created by these groupings are set out in the Appendix to this opinion.
 
 North Area
 
 34
 The North Area contains a bloc of four schools-- Charles Drew, Markham, Coleman, and Sanders Park-- which are more than 90 percent black. Several nearby schools, however, are predominantly white or all-white. Thus all four schools can be desegregated by use of the pairing/clustering technique. In fact, because of the arrangement of the zones in this area, several reasonable alternatives exist. We have listed these alternative arrangements below as Plans 'A' through 'F.' The decision as to which plan to implement is left to the district court. Each plan includes a slightly different combination of pairing and grouping, although the result in each case is a total of four attendance zones. We express no preference for any particular plan, for each plan presents a satisfactory method of desegregating the four overwhelmingly black schools. The district court shall order the implementation of one of the following pairing/clustering plans:
 
 Plan A
 
 35
 (1) Charles Drew and Coconut Creek (2) Markham, Tedder, and Palmview (3) Coleman and Cypress (4) Sanders Park, Pompano Beach, and Cresthaven
 
 Plan B
 
 36
 (1) Charles Drew and Coconut Creek (2) Markham and Cypress (3) Coleman, Pompano Beach, and Cresthaven (4) Sanders Park, Palmview, and TedderPlan C
 
 
 37
 (1) Charles Drew, Coconut Creek, and Cypress (2) Markham and Tedder (3) Coleman and Pompano Beach (4) Sanders Park, Palmview, and Cresthaven
 
 Plan D
 
 38
 (1) Charles Drew, Coconut Creek, and Cypress (2) Markham, Palmview and Tedder (3) Coleman and Pompano Beach (4) Sanders Park and Cresthaven
 
 Plan E
 
 39
 (1) Charles Drew, Coconut Creek, and Tedder (2) Markham and Cypress (3) Coleman and Pompano Beach (4) Sanders Park, Palmview, and Cresthaven
 
 Plan F
 
 40
 (1) Charles Drew, Coconut Creek, and Tedder (2) Markham, Palmview, and Crest-haven (3) Coleman and Cypress (4) Sanders Park and Pompano Beach
 
 
 41
 The projected student enrollments in the attendance zones created by each of these alternative arrangements are set out in the Appendix to this opinion.
 
 IMPLEMENTATION
 
 42
 The district court is directed to implement the above modifications in the Broward County School System for the 1970-71 school year.
 
 
 43
 In ordering the pairings and groupings described above we have not suggested which specific grades should be assigned to which specific schools. Those decisions are left to the district court. With his ready access to the expertise of the school board, the district court is better situated than we are to make those decisions. However, in deciding which grades will attend which schools, the district court is ordered to comply with the following requirements: (1) In every attendance zone created by pairing and clustering the court must make every reasonable effort to avoid 'splitting' a grade, i.e., assigning any particular grade to more than one school. (2) If in some instances it does become necessary to split a grade, the court will assign the students in that grade in such a manner that the degree of desegregation ordered by this court for that attendance zone will not be diminished.
 
 
 44
 With regard to all other aspects of the desegregation plan as modified by this opinion, the district court shall be free to exercise his discretion to order alterations and adjustments submitted by the school board or by any other party. The district court's discretion shall be limited, however, to the extent that no alteration or adjustment may be ordered if its implementation would diminish the degree of desegregation projected by this opinion. See Pate v. Dade County School Board, 5 Cir. 1970, 434 F.2d 1151.
 
 
 45
 It is axiomatic, of course, that the school board and the district court are under a continuing duty to appraise the school system in the light of actual conditions and experience and, within the limits we have just indicated, to make whatever changes are necessary, now and in the future, to assure the continued maintenance of a unitary system.
 
 
 46
 The mandate in this cause shall issue forthwith. No stay will be granted pending petition for rehearing or application for writ of certiorari.
 
 
 47
 Affirmed in part; reversed in part; remanded with direction.
 
 
 48
 APPENDIX
 Student Desegregation Achieved by Pairing and Clustering Schools
 SOUTH AREA
 Percentage
School Zone Black White Total Black
Carver Ranches-Orange Brooks- Watkins-Lake 1149 1734 2883 39.85
 Forest
Moore-Colbert-Hollywood Central-Hallandale 866 1533 2399 36.09
 CENTRAL AREA
 Percentage
School Zone Black White Total Black
Larkdale-Lauderhill-Castle Hill 1264 1394 2658 47.55
Broward Estates-Plantation-Pine Ridge 865 1235 2100 41.19
Sabal Palm-Westwood Heights-Sunset 816 1203 2019 40.41
Lincoln Park-North Fork-Hortt-Riverland 1179 1083 2262 52.12
Walker-North Side-East Side 933 1003 1936 48.19
Dillard-Lauderdale Manors-Wilton Manors 982 1220 2202 44.59
Rock Island-Oriole-Lloyd Estates 697 1181 1878 37.11
 NORTH AREA--PLAN A
 Percentage
School Zone Black White Total Black
Charles Drew-Coconut Creek 1024 706 1730 59.19
Markham-Tedder-Palmview 737 1171 1908 38.62
Coleman-Cypress 601 750 1351 44.48
Sanders Park-Pompano Beach-Cresthaven 686 1416 2102 32.63
 NORTH AREA--PLAN B
 Percentage
School Zone Black White Total Black
Charles Drew-Coconut Creek 1024 706 1730 59.19
Markham-Cypress 536 785 1321 40.57
Coleman-Pompano Beach-Cresthaven 621 1393 2014 30.83
Sanders Park-Palmview-Tedder 867 1159 2026 42.79
 NORTH AREA--Plan C
 Percentage
School Zone Black White Total Black
Charles Drew-Coconut Creek-Cypress 1024 1431 2455 41.71
Markham-Tedder 536 688 1224 43.79
Coleman-Pompano Beach 621 688 1309 47.44
Sanders Park-Palmview-Cresthaven 867 1236 2103 41.22
 NORTH AREA--Plan D
 Percentage
School Zone Black White Total Black
Charles Drew-Coconut Creek-Cypress 1024 1431 2455 41.71
Markham-Plainview-Tedder 737 1171 1908 38.62
Coleman-Pompano Beach 621 688 1309 47.44
Sanders Park-Cresthaven 666 753 1419 46.93
 NORTH AREA--Plan E
 Percentage
School Zone Black White Total Black
Charles Drew-Coconut Creek-Tedder 1024 1334 2358 43.42
Markham-Cypress 536 785 1321 40.57
Coleman-Pompano Beach 621 688 1309 47.44
Sanders Park-Palmview-Cresthaven 867 1236 2103 41.22
 NORTH AREA--Plan F
 Percentage
School Zone Black White Total Black
Charles Drew-Coconut Creek-Tedder 1024 1334 2358 43.42
Markham-Palmview-Cresthaven 737 1248 1985 37.12
Coleman-Cypress 601 750 1351 44.48
Sanders-Pompano Beach 686 711 1397 49.10
 
 
 49
 ON PETITION FOR REHEARING AND PETITION FOR REHEARING EN BANC
 
 PER CURIAM:
 
 50
 The Petition for Rehearing is denied and no member of this panel nor Judge in regular active service on the Court having requested that the Court be polled on rehearing en banc, (Rule 35 Federal Rules of Appellate Procedure; Local Fifth Circuit Rule 12) the Petition for Rehearing En Banc is denied.
 
 
 
 [1]
 This appeal was expedited in accordance with the procedures outlined in Singleton v. Jackson Municipal Separate School District, 5 Cir. 1970, 419 F.2d 1211, 1222 (en banc), rev'd in part on other grounds sub nom. Carter v. West Feliciana Parish School Board, 1970, 396 U.S. 290, 90 S.Ct. 608, 24 L.Ed.2d 477
 
 
 [2]
 Singleton v. Jackson Municipal Separate School District, 5 Cir. 1970, 419 F.2d 1211 (en banc), rev'd in part sub nom. Carter v. West Feliciana Parish School Board, 1970, 396 U.S. 290, 90 S.Ct. 608, 24 L.Ed.2d 477 (per curiam) (reversal limited to the issue of timing of student desegregation)
 
 
 [3]
 The court's order also noted that the school board, apparently on its own initiative, had made plans to conduct an extensive orientation program to prepare faculty and staff for the advent of desegregation. We are inclined to agree with the Board that 'although Singleton did not require such an orientation program, obviously one is necessary if the unitary school system plan is going to work.' Brief of appellees at 9
 
 
 [4]
 This priority provision, of course, applies only to transfer requests made prior to the beginning of each school term. When a transfer request is received by the school board during a school term, it may be denied at that time if there is no space available in the school to which the student wishes to transfer. In such a situation the transfer request will be deferred until the beginning of the next school term, at which time the transfer applicant will be given an absolute priority for space
 
 
 [5]
 In his final order entered on April 30, 1970, the district judge correctly defined 'pairing' as 'combining the attendance areas of (two) schools and sending all students in certain grades to one of the schools and all students in the other grades to the other school.' The terms 'grouping' and 'clustering' connote the same technique when applied to three or more schools
 
 
 [6]
 Pate v. Dade County School Board, 5 Cir. 1970, 434 F.2d 1151
 
 
 [7]
 Bradley v. Board of Public Instruction of Pinellas County, 5 Cir. 1970, 431 F.2d 1377
 
 
 [8]
 Mannings v. Board of Public Instruction of Hillsborough County, 5 Cir. 1970, 427 F.2d 874
 
 
 [9]
 Wright v. Board of Public Instruction of Alachua County, 5 Cir. 1970, 431 F.2d 1200
 
 
 [10]
 Henry v. Clarksdale Municipal Separate School District, 5 Cir. 1970, 433 F.2d 387
 
 
 [11]
 Singleton v. Jackson Municipal Separate School District, 5 Cir. 1970, 432 F.2d 927