**Derek Jerome SINGLETON et al.,**
**Plaintiffs-Appellants,**

v.

**JACKSON MUNICIPAL SEPARATE**
**SCHOOL DISTRICT et al.,**
**Defendants-Appellees.**

**No. 29226.**

United States Court of Appeals,
Fifth Circuit.

May 5, 1970.

Rehearing Denied and Rehearing En Banc
Denied July 13, 1970.

See also 5 Cir., 425 F.2d 1211.

Fred L. Banks, Jr., Melvyn R. Leventhal, Reuben V. Anderson, John A. Nichols, Jackson, Miss., Jack Greenberg, James M. Nabrit, III, Norman J. Chachkin, Jonathan Shapiro, New York City, for plaintiffs-appellants.

Robert C. Cannada, Thomas H. Watkins, Jackson, Miss., for defendants-appellees.

Jerris Leonard, Asst. Atty. Gen., David D. Gregory, Atty., Civil Rights Div., U. S. Dept. of Justice, Washington, D. C., amicus curiae.

Before JOHN R. BROWN, Chief Judge, and MORGAN and INGRAHAM, Circuit Judges.

JOHN R. BROWN, Chief Judge.

This is an appeal from an order of the District Court entered pursuant to the remand from Singleton v. Jackson Municipal Separate School District (Singleton III),[1] 5 Cir., 1969, 419 F.2d 1211 (consolidated cases en banc), rev'd in part, sub nom., Carter v. West Feliciana Parish School Bd., 1970, 396 U.S. 290, 90 S.Ct. 608, 24 L.Ed.2d 477. Prior to this remand the district was operating under a *Jefferson* [1a] model freedom-of-choice plan. And after remand for the adoption of a unitary plan the District Court called for the school board to invoke the assistance of the Office of Education of the United States Department of Health, Education and Welfare in preparing new desegregation plans. HEW filed a plan with three alternative proposals for secondary schools. The school board proposed modifications (see note 8, *infra*) that reduced the amount of desegregation that would result and these modifications were, after an evidentiary hearing on January 19, 1970, for the most part approved by the District Court. And this new plan was ordered implemented on February 1, 1970.

■■ Our concern is whether the system approved by the District Court is unitary. We believe that, although faculty,[2] staff, extra curricular activities, etc., see Green v. County School Bd. of New Kent County, 1968, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716; Ellis v. Board of Public Inst. of Orange Cty., 5 Cir., 1970, 423 F.2d 203, appear so far to have become unitary, the existence of a substantial number of schools with segregated student bodies, the students of which will for a large part have a completely segregated education, prevents the system from being a unitary one when there is a reasonable alternative plan that will result in a more nearly unitary system. We thus remand this case.[3]

## I.

### The Proposals for Unitary System

At the commencement of the 1969–70 school year, Jackson had 10,527 Negro and 10,432 white elementary school students attending 38 elementary schools.

1. This is one of a long series of cases involving the Jackson Municipal School District's operation of a dual school system. Evers v. Jackson Municipal Separate School Dist., 5 Cir., 1964, 328 F.2d 408; Singleton v. Jackson Municipal Separate School Dist., 5 Cir., 1965, 348 F.2d 729 (Singleton I); Singleton v. Jackson Municipal Separate School Dist., 5 Cir., 1966, 355 F.2d 865 (Singleton II).

1a. United States v. Jefferson County Board of Education, 5 Cir., 1966, 372 F.2d 836.

2. We note that the District Court's order providing for the reassignment of faculty and staff obligated the school district to meet the *Singleton III* faculty-staff assignment ratio, which by its terms prescribed ratios for the 1969–70 school year, only for the 1969–70 school year. But it is plain that resegregation can occur as much from faculty assignments as from student assignments. And it is plain that any future substantial deviations from the Singleton III ratios will require a showing that there is a unitary system and that such deviations will not tend to reestablish a dual system. We emphasize this without any prejudgment of the merits because plaintiffs-appellants have suggested in the comments requested by the Court (see notes 3, 4, 5, and 6, *infra*) that there is a significant possibility that the school district will abandon these ratios for the 1970–71 school year.

3. Under the stringent requirements of Alexander v. Holmes County Board of Education, 396 U.S. 19, 90 S.Ct. 29, 24 L.Ed.2d 19, which this court has carried out in United States v. Hinds County School Board, 5 Cir., 1969, 423 F.2d 1264, this court has judicially determined that the ordinary procedures for appellate review in school segregation cases have to be suitably adapted to assure that each system whose case is before us "begin immediately to operate as unitary school systems." Upon consideration of the record the court has proceeded to dispose of this case as an extraordinary matter. Rule 2, FRAP. The Court has, however, solicited supplemental briefs and data and has all necessary material for consideration on the merits. (See notes 4, 5, and 6 *infra*)

Of those schools, 13 were all- or virtually all-Negro and 20 were all- or nearly all-white. Of the 5 substantially integrated schools, 3 were predominantly Negro, 2 predominantly white. And Jackson was operating 9 junior high schools (grades 7–9), 2 junior-senior high schools (grades 7–12), and 6 senior high schools (grades 10–12). There were 7,700 Negro and 10,380 white students enrolled. Of those students, 7,300 (93.5%) Negroes were enrolled in 6 all-Negro schools. All of the white students attended 11 schools ranging from 86.5 to 100 percent white.

### A. The Basics of the HEW Plan

The plan suggested by HEW to remedy this is essentially a zone plan. It was constructed on the assumption that other alternatives were foreclosed by state statutory limitations on state-granted financial assistance to local school districts to provide intracity transportation.[4] In addition, the HEW plan indicated that other limitations "to developing a plan resulting in total desegregation of all schools in the system were" (1) the size of the district, (2) natural and man-made barriers that constitute safety hazards and restrict mobility,[5] (3) demographic pattern of the district, (4) lack of a compulsory attendance law, (5) possibility of resegregation and (6) the need to develop a "plan which would result in the least amount of disruption and which would be implemented immediately."

### B. The Results at the Elementary Level [6]

The HEW plan was a zoning plan within the framework of the former 1–6 grade structure. The zoning was designed to maximize desegregation and was supplemented by pairing of two schools and a cross-zone assignment of two schools. It was projected that the plan would produce 5 all-white schools and 6 all-black schools with 15 predominantly

4. At the Court's request counsel for plaintiffs-appellants and the school board supplied the Court with copies of the state statutes that restrict financial assistance to local districts for intracity bussing. Miss.Stat.Ann. § 6336–01 et seq. They were asked to comment on the constitutionality of the statutes and counsel agreed that the statutes of the state did not suffer from any constitutional defects since the school district has the power to provide transportation to pupils not eligible for state-aided bussing (Miss. Stat.Ann. § 6336–01).

5. Counsel were also asked to comment on the extent to which these barriers were a limitation on the development of a unitary school district. The following is part of the statement of Dr. H. Larry Winecoff, director of the team that prepared the HEW plan. The statement was submitted pursuant to the Court's request:

"We did not consider that there were any natural or manmade barriers in Jackson to our Junior-Senior High School program. However, at the elementary level the following such barriers exist, and were considered:

1) Highway 80 located in South Jackson. This four lane highway prevented us from assigning black children in grades 1–5 to Key and Lester and it prevented the assignment of white children to Isable. We considered 6th graders old enough to negotiate this barrier.

2) There is an airport-industrial complex-golf course, located in the midwestern section of the Town. This area limited our alternatives to some extent.

3) There is a railroad freight yard in the inner-city which limited our alternatives to some extent."

6. Plaintiffs-appellants' original complaint was that the dual system had not been eliminated at the secondary level. Their complaints regarding the elementary level were concerned only with situations where there was a very close relationship between the elementary and secondary level as in the Isable-Hill complex, which under the HEW plan would serve both as an elementary and 9–10 grade school. As we did in *Singleton III*, however, we look at the whole system. And plaintiffs-appellants have, after letter inquiry from this Court (see notes 4 and 5, *supra*), challenged the modifications of the elementary plan approved by the District Court. But we do not limit ourselves to these modifications. Instead, we concern ourselves with the overall workings of the system—all aspects of the elementary and secondary levels.

white schools and 12 predominantly black schools.[7]

This was basically the plan adopted by the District Court.[8] But not even these projected results have been achieved. As of March 26, 1970 [9] there were seven elementary schools with all black student bodies and six more in which the student body is made up of at least ninety percent Negro students. In addition there are 6 elementary schools out of a total of 38 that have only white students attending them and two other schools with over ninety percent white student bodies.

### C. Results at the Secondary Level

The direct challenge here is not, however, to the elementary system, but is to the school board's modifications of the HEW plan—or more appropriately plans A, B, and C—at the secondary level. (See note 6, *supra*). The HEW plans were based on principles of pairing and zoning. All three plans resulted in breakdown of the grade structure—6–3–3 —under which the district had previously been operating. Plan B, for which plaintiffs-appellants expressed a preference, proposes geographic zoning with junior high schools continuing to serve one or more of grades 7 through 9. Under Plan B, of the eleven junior high schools, one would serve grades 7–9, six would serve grades 7–8, and four would serve grade 9 only. Plan B calls for the same type of organization at the high school level—six high schools are to serve grades 10–12, two are to serve grades 11–12, and one grade 10 only.

The modifications proposed by the Board and adopted by the District Court were not really modifications at all. They were instead a completely different plan based on geographic zoning. The zoning was, however, based on the assumption of retaining the District's 6–3–3 grade structure.

After approximately six weeks operation under this plan there were 7537 white students and 8156 Negro students in the District's secondary schools. There were no all-Negro or all-white secondary schools. (See Appendix B). There are, however, at least four schools where the student body is overwhelmingly Negro.[10] In contrast, the projected enrollment under any of the HEW plans would not have produced any virtually all-Negro schools. See Appendices C–E.

### II.

### Deficiencies in the Present Plan

It is not contended that the school board's zoning plan was gerrymandered to produce little desegregation. But it is contended that the school board plan is not the best available alternative. Andrews v. City of Monroe, 5 Cir., 1970, 425 F.2d 1017. And it is contended that the board has not carried "its * * * heavy burden * * * to explain its preference for an apparently less effective method." Green v. County School Board of New Kent County, 1968, 391 U.S. 430, 439, 88 S.Ct. 1689, 1695, 20 L. Ed.2d 716, 724. It is also claimed that

---

7. The projected enrollment for each elementary school under this HEW plan is set out in Appendix A.

8. The board's proposed modifications at the elementary level focused on 8 schools. The board requested that the number of Negroes assigned to 4 predominantly white schools be reduced, that one school that was projected to be predominantly Negro be made predominantly white and that the enrollment of 3 all Negro schools be increased. The schools affected were Key, Lester, Watkins, Green, Duling, Isabelle, Walton and Morrison. See Appendix A. The District Court allowed the proposed modifications where it

found that the capacity of the school would be exceeded under the HEW plan and where portable classrooms would have to be relocated.

9. At the Court's request the school board supplied the Court with the latest enrollment data available as of March 26, 1970. This information is set out in Appendix B.

10. Blackburn Junior High has 593 Negroes and 34 whites, Rowan Junior High has 609 Negroes and 31 whites, Brinkley High School has 1076 Negroes and 2 whites, Lanier High School has 713 Negroes and 7 whites. See Appendix B.

the school board's secondary plan zone lines were not drawn to promote desegregation as required by this Court. Valley v. Rapides Parish School Bd., 5 Cir., 1970, 423 F.2d 1132; United States v. Indianola Municipal Separate School Dist., 5 Cir., 1969, 410 F.2d 626; Davis v. Board of School Commissioners of Mobile County, 5 Cir., 1968, 393 F.2d 690.

■ We are of the clear view that the plaintiffs'-appellants' complaints are valid. Jackson Separate School District is not a unitary system. The deficiencies do not lie in the simple existence of some schools that are all or virtually all Negro or white. They lie instead in the fact that a substantial number of Negro students will receive their entire public school education in a segregated school environment,[11] which is presumably largely the result of the State's operation of a dual school system with schools located to serve that system. And these deficiencies are critical in light of the existence of readily available means, which can be implemented without significant administrative, educational, economic, or transportation costs (see note 14, *infra*), to avoid for substantially all the students of this district the school life-long segregated education. See Andrews v. City of Monroe, *supra.*

This Court realizes that the time for adoption and effectuation of a plan in this school district was short and that the physical and logistical problems involved were great. And it recognizes that significant progress has been achieved both as to the student body and the other *Green* factors as a result of the plan put into effect pursuant to the District Court's order. Although under the stringent mandate of Alexander v. Holmes County Board of Education, 1969, 396 U.S. 19, 90 S.Ct. 29, 24 L.Ed. 2d 19; Carter v. West Feliciana Parish School Board, 1970, 396 U.S. 290, 90 S. Ct. 608, 24 L.Ed.2d 477, this was to be a final plan, two things warrant comment. First, the Judge approached it in terms or immediacy with some expectation of correcting deficiencies [12] revealed by actual operation. Second, we have to look on it in terms of its acceptability as a final plan now.

Furthermore, we are not now confronted with the problems and dislocations that a midyear change in the traditional grade structure—6–3–3—would involve. (See III (2), *infra*). Although the changes under the HEW plans for the secondary schools may require future adjustment, they are not educationally, administratively, or economically unreasonable. And it appears that under these

11. Although there is no formal feeder system up the ladder from grade 1 through 12 in the District, a comparison of attendance zone lines for elementary and secondary schools indicates that out of a total Negro student body of 10,558, about 3500 Negro elementary students attending all Negro elementary schools will attend virtually all Negro secondary schools.

12. It is apparent from reading the District Court's opinion that the practical problems faced by the school district took on great importance. It seems clear that this was the basic reason the Trial Judge adopted the school board's secondary plan. It minimized the disruption resulting from a change in the grade structure and the need to relocate portable classrooms.

He said:
"The Board modification [as to junior high schools] would retain the current

3-grade structure; obviating the necessity of formulating new curricula for a different structure, as proposed by HEW, and would tend to lessen the additional bus transportation the HEW plans call for, all of which the Court finds are practical considerations in view of the immediacy of conversion.

\* \* \*

\* \* \* \* \*

\* \* \* Changes as proposed by the HEW plans would require an extension of time, not now available, in reorganizing physical facilities, re-registering pupils, re-assigning members of the faculty, rearranging the present 3-grade curricula, constructing additional classrooms or relocating temporary or portable classrooms, and transferring supplies and equipment, including the reinstallation of biology laboratory equipment."

circumstances and in this case, subject, of course, to the experience of actual operation, there is a good possibility that these plans will establish a unitary school system at the secondary level.

### III.

### Steps to be Taken to Correct Deficiencies

In order to achieve a unitary system it is necessary that steps be taken immediately:

■ 1. A majority to minority transfer rule [13] must be adopted and all transferring students must be given transportation if they desire it. As approved in Ellis v. Board of Public Inst. of Orange Cty., 1970, 423 F.2d 203, the transferee is to be given priority for space and thus the transfer is not to be dependent on space being available. See also Taylor v. Ouachita Parish School Bd., 5 Cir., 1970, 424 F.2d 324.

2. Second, the district is to adopt one of the presently available HEW plans for the secondary level for use in the 1970-71 school year. These are the only currently available plans that give any promise of presently ending the dual system.[14] United States v. Board of Education of Baldwin Cty., 5 Cir., 1970, 423 F.2d 1013; Banks v. Claiborne Parish School Board, 5 Cir., 1970, 425 F.2d 1040. The plan adopted shall remain in effect until, after substantial operation under the plan during the 1970-71 school year, it can be shown that modifications [15] are needed and there is a finding that such modifications will not tend to reestablish a dual school system or that operation under the plan has not in fact produced a unitary system. We specify July 1, 1970 [16] as the date to be fixed by the District Court for making pupil assignments for the 1970-71 school year and notifying parents of those assignments.

3. The District Court shall without delay initiate proceedings to eliminate the dual system which still remains in the elementary level. The District Court shall call for new proposals from the parties, HEW, and the Bi-Racial committee.

13. Counsel have indicated it was intended that a majority to minority transfer provision be included in the District Court's order and that its omission was inadvertent.

14. As illustrated by the following chart the HEW plans will result in no major changes in the number of students transported by the system.

| Plan | Students Transported |
| --- | --- |
| Freedom of Choice (Prior to Remand | 2379 |
| HEW A | 3567 |
| HEW B | 2234 |
| HEW C | (same as plan B) |

(figures for the present plan are unavailable)

In fact, HEW Plan B would reduce the transportation burden below that under the freedom of choice plan. Moreover, nearly all problems of building capacity can be solved by the shifting of presently available portable buildings. And there are no major problems of either economics or administration presented by the plan.

15. In connection with both the mandatory revision at the elementary level and the likelihood of some modifications being proposed for the secondary level, it bears emphasizing that Ellis does not stand for the universal proposition that equidistant or capacity zoning establishes unitary schools in all cases. This is the clear holding of our recent case of Andrews v. City of Monroe, 5 Cir., 1970, 425 F.2d 1017 which quotes the following from Ellis:

" 'Under the facts of this case, it happens that the school board's choice of a neighborhood assignment system is adequate to convert the Orange County school system from a dual to a unitary system. This decision does not preclude the employment of differing assignment methods in other school districts to bring about unitary systems. There are many variables in the student assignment approach necessary to bring about unitary school systems. The answer in each case turns, in the final analysis, as here, on all of the facts including those which are peculiar to the particular system.' "

Andrews, supra, 425 F.2d at 1019, quoting Ellis, supra, 423 F.2d at 208.

16. Pursuant to letter request by the Court, see notes 4, 5 and 6, supra, counsel inform us that the present school year ends on June 4, 1970, and that classes begin for the 1970-71 school year on September 8, 1970.

It is evident that the factors delineated by the HEW plans as reasons for not more fully desegregating the elementary level cannot justify this continued segregation. And it is also evident that the burden will be heavy on the school district to find alternatives that hold promise of disestablishing the dual system now. And the District Court shall make findings of fact that specifically evaluate the alternatives in terms of cost as well as administrative, educational, or economic factors bearing on the elimination of the dual system. The findings shall specifically include the reasons, if any, for the continuation of any all Negro or all white schools.[17] The District Court shall expedite this proceeding and shall have completed all findings and entered all orders by June 15, 1970. The time for assignments and notification pursuant to this order is, as in paragraph 2 above, to be on July 1, 1970. Further proceedings in the District Court are to conform to part III of Singleton v. Jackson Municipal Separate School District, 5 Cir., 1969, 419 F.2d 1211 (consolidated cases en banc).

4. Following the pattern of *Ellis, supra*, and United States v. Hinds County School Bd., 5 Cir., 1970, 423 F.2d 1264, a Bi-Racial committee is to be constituted by the District Court from names submitted by the parties to this suit. The number of members is to be left to the District Court, but there shall be no more than 40 nor less than 10 members. The membership is to be divided equally between whites and Negroes. The chairmanship is to alternate annually between a white chairman and a Negro chairman. This committee is to recommend to the school board ways to attain and maintain a unitary system.

5. Finally, the District Court is to retain jurisdiction of this case and the school board and the Bi-Racial committee are to make bi-annual reports—on December 1 and April 1—to it on the maintenance of a unitary school system.[18] Such reports are to be made until the District

---

17. On this record in this posture, we do not prejudge whether, to what extent, or under what circumstances such conditions may exist and satisfy the requirements of a unitary system.

18. The reports should include the following information:

I.
(a) The number of students by race enrolled in the school district;
(b) The number of students by race enrolled in each school of the district;
(c) The number of students by race enrolled in each classroom in each of the schools in the district.

II.
(a) The number of full time teachers by race in the district;
(b) The number of full time teachers by race in each school in the district;
(c) The number of part time teachers by race in the district;
(d) The number of part time teachers by race in each school in the district.

III.
Describe the requests and the results which have accrued, by race, under the majority to the minority transfer provision which was a part of this court's order of November 7, 1969.

IV.
State the number of inter-district transfers granted since this court's order of November 7, 1969, the race of the students who were granted such transfers, and the school district to which the transfers were allowed.

V.
State whether the transportations system, if any, in the district is desegregated to the extent that Negro and white students are transported daily on the same buses.

VI.
State whether all facilities such as gymnasiums, auditoriums, and cafeterias are being operated on a desegregated basis.

VII.
Give brief description of any present or proposed construction or expansion of facilities.

VIII.
(a) State whether the school board has sold or abandoned any school facility, equipment, or supplies having a total value of more than $500.00 since this court's order of November 7, 1969.

IX.
(a) Give a brief description of the work of the bi-racial committee since the last report.
(b) Copies of all recommendations made by the Bi-Racial committee.

See United States v. Hinds County School Board, 5 Cir., 1969, 417 F.2d 852.

Court finds that the dual system will not be or tend to be reestablished.

Reversed and remanded.

### Appendix A
### Projected Enrollment under HEW Plan
### for Elementary Schools

| School | White | Negro | Building Capacity |
|---|---|---|---|
| Sykes | 544 | 0 | 576 |
| Lee | 370 | 0 | 416 |
| Marshall | 600 | 0 | 576 |
| Baker | 310 | 24 | 512 |
| Wilkins | 600 | 16 | 416 |
| Key | 513 | 68 | 576 |
| Lester | 320 | 152 | 480 |
| Clausell | 47 | 165 | 224 |
| Isable* | 0 | 640 | 1120 |
| Reynolds | 0 | 1009 | 1088 |
| George | 100 | 106 | 192 |
| Martin | 76 | 220 | 384 |
| Lake | 600 | 0 | 576 |
| Whitfield | 282 | 166 | 416 |
| Barr | 123 | 90 | 192 |
| Poindexter | 47 | 102 | 192 |
| Robertson | 6 | 575 | 544 |
| Davis | 46 | 182 | 224 |
| Jones | 70 | 1171 | 1248 |
| Galloway | 185 | 262 | 448 |
| Brown | 0 | 575 | 832 |
| Power | 383 | 216 | 544 |
| Raines | 780 | 72 | 736 |
| French | 354 | 83 | 576 |
| Johnson | 71 | 1023 | 1088 |
| Duling | 194 | 227 | 448 |
| Casey | 420 | 0 | 576 |
| Bradley | 33 | 293 | 384 |
| Smith | 0 | 917 | 928 |
| Walton | 0 | 527 | 1120 |
| Dawson | 65 | 387 | 608 |
| Morrison | 0 | 338 | 616 |
| Watkins | 773 | 291 | 608 |
| Boyd | 395 | 127 | 576 |
| Green | 380 | 149 | 576 |
| McWillie | 624 | 74 | 620 |
| Spann | 539 | 39 | 540 |
| McLeod | 500 | 66 | 608 |

*Not considered an all black school under the HEW plan because it was to be part of an integrated elementary-secondary complex.

### Appendix B
### JACKSON PUBLIC SCHOOLS
### Jackson, Mississippi

*Student Enrollment as of March 26, 1970*

| SCHOOL Elementary | Negro | Other | Total |
|---|---|---|---|
| Baker | 4 | 321 | 325 |
| Barr | 41 | 83 | 124 |
| Boyd | 168 | 420 | 588 |
| Bradley | 339 | 14 | 353 |
| Brown | 658 | 0 | 658 |
| Casey | 0 | 451 | 451 |
| Clausell | 201 | 5 | 206 |
| Davis | 309 | 55 | 364 |
| Dawson | 421 | 10 | 431 |
| Duling | 126 | 115 | 241 |
| French | 138 | 313 | 451 |
| Galloway | 388 | 170 | 558 |
| George | 67 | 111 | 178 |
| Green | 123 | 480 | 603 |
| Isable | 760 | 0 | 760 |
| Johnson | 857 | 54 | 911 |
| Jones | 1248 | 10 | 1258 |
| Key | 0 | 487 | 487 |
| Lake | 0 | 609 | 609 |
| Lee | 0 | 365 | 365 |
| Lester | 99 | 236 | 335 |
| Marshal | 0 | 569 | 569 |
| Martin | 207 | 20 | 227 |
| McLeod | 50 | 669 | 719 |
| McWillie | 64 | 502 | 566 |
| Morrison | 481 | 0 | 481 |
| Poindexter | 91 | 85 | 176 |
| Power | 37 | 368 | 405 |
| Raines | 131 | 502 | 633 |
| Reynolds | 999 | 0 | 999 |
| Robertson | 317 | 0 | 317 |
| Smith | 1024 | 0 | 1024 |
| Spann | 47 | 491 | 538 |
| Sykes | 0 | 457 | 457 |
| Walton | 852 | 0 | 852 |
| Watkins | 132 | 517 | 649 |
| Whitfield | 163 | 238 | 401 |
| Wilkins | 16 | 490 | 506 |
| **TOTAL** | **10558** | **9217** | **19775** |

| *Secondary* | *Negro* | *Other* | *Total* |
|---|---|---|---|
| Bailey | 514 | 408 | 922 |
| Blackburn | 593 | 34 | 627 |
| Chastain | 523 | 660 | 1183 |
| Enochs | 562 | 101 | 663 |
| Hardy | 424 | 758 | 1182 |
| Peeples | 218 | 864 | 1082 |
| Powell | 796 | 673 | 1469 |
| Rowan | 609 | 31 | 640 |
| Whitten | 346 | 579 | 925 |
| Brinkley | 1076 | 2 | 1078 |
| Callaway | 86 | 1027 | 1113 |
| Central | 192 | 564 | 756 |
| Hill | 376 | 50 | 426 |
| Lanier | 713 | 7 | 720 |
| Murrah | 180 | 864 | 1044 |
| Provine | 278 | 637 | 915 |
| Wingfield | 51 | 897 | 948 |
| **TOTAL** | **7537** | **8156** | **15693** |

| | | |
|---|---|---|
| TOTAL ELEMENTARY | | 19775 |
| TOTAL SECONDARY | | 15693 |
| GRAND TOTAL | | 35468 |

### Appendix C
#### Projected Secondary Enrollment
#### Under HEW Plan A

##### Junior High

| School | Grades | White | Negro | Building Capacity |
|---|---|---|---|---|
| Whitten | 7-8 | 370 | 165 | 868 |
| Peeples | 7-8 | 801 | 282 | 1286 |
| Isable-Hill | 9 | 501 | 190 | Hill 200 Isabell 500 |
| Blackburn | 7-8-9 | 268 | 756 | 1458 |
| Hardy | 7-8 | 572 | 697 | 1278 |
| Enochs | 9 | 248 | 293 | 830 |
| Bailey | 7-8 | 692* | 632* | 1310 |
| Rowan | 9 | 285 | 281 | 996 |
| Chastain | 7-8 | 823 | 482 | 1234 |
| Powell | 9 | 509 | 379 | 1574 |
| Callaway | 7-8 | 456** | 402** | 550 |

*(W)942, (N)682, option from Calloway overflow 8th to Rowan.
**(W)206, (N)350, option.

##### Senior High

| School | Grades | White | Negro | Building Capacity |
|---|---|---|---|---|
| Hill | 10 | 532 | 167 | 894 |
| Wingfield | 11-12 | 924 | 289 | 894 |
| Provine | 10-12 | 873 | 533 | 1180 |
| Murrah | 11-12 | 772 | 531 | 1180 |
| Brinkley | 10 | 875 | 762 | 1154 |
| Callaway | 11-12 | 851 | 759 | 448 |

### Appendix D
#### Projected Secondary Enrollment
#### Under HEW Plan C

| School | Grades | White | Negro | Building Capacity |
|---|---|---|---|---|
| Peeples-Whitten | 7-8 | 1382 | 438 | 2154 |
| Enochs | 7-8 | 128 | 408 | 830 |
| Hardy | 7-8 | 549 | 587 | 1286 |
| Bailey-Rowan | 7-8 | 1243 | 983 | 2306 |
| Chastain | 7-8 | 884 | 546 | 1434 |
| Hill-Isable | 9-10 | 1022 | 401 | 1374 |
| Blackburn | 9-10 | 691 | 869 | 1458 |
| Brinkley | 9-10 | 645 | 531 | 1154 |
| Powell | 9-10 | 1085 | 708 | 1574 |
| Wingfield | 11-12 | 825 | 338 | 894 |
| Provine | 11-12 | 507 | 581 | 1180 |
| Murrah | 11-12 | 707 | 502 | 1180 |
| Callaway | 11-12 | 779 | 584 | 998 |

### Appendix E
#### RACIAL COMPOSITION OF STUDENT BODIES
#### JACKSON MUNICIPAL SEPARATE SCHOOL
#### DISTRICT

| SCHOOLS JUNIOR HIGH: | Under HEW Plan B WHITE | NEGRO |
|---|---|---|
| Whitten | 370 | 165 |
| Peeples | 801 | 282 |
| Isable-Hill | 501 | 190 |
| Blackburn | 268 | 756 |
| Hardy | 572 | 697 |
| Enochs | 248 | 293 |
| Bailey | 942 | 682 |
| Rowan | 285 | 281 |
| Chastain | 823 | 482 |
| Powell | 509 | 379 |
| Callaway | 206 | 350 |
| Lanier | 0 | 0 |

| SENIOR HIGH: | | |
|---|---|---|
| Brinkley | 627 | 629 |
| Callaway | 853 | 441 |
| Murrah | 707 | 625 |
| Provine | 741 | 521 |
| Hill | 456 | 169 |
| Wingfield | 730 | 276 |

| MAGNET HIGH SCHOOLS: | | |
|---|---|---|
| Central | 823 | 532 |
| Lanier | 734 | 339 |

## ON PETITION FOR REHEARING AND PETITION FOR REHEARING EN BANC

### PER CURIAM:

The Petition for Rehearing is denied and the Court having been polled at the request of one of the members of the Court and a majority of the Circuit Judges who are in regular active service not having voted in favor of it, (Rule 35 Federal Rules of Appellate Procedure; Local Fifth Circuit Rule 12) the Petition for Rehearing En Banc is also denied.

COLEMAN, Circuit Judge, voted in favor of an en banc rehearing.