**Delores ROSS et al., Plaintiffs-Appellants, United States of America, Plaintiff-Intervenor-Appellant,**

**v.**

**Robert Y. ECKELS, etc., et al., Defendants-Appellees.**

**No. 30080.**

United States Court of Appeals, Fifth Circuit.

Aug. 25, 1970.

Stay Denied March 1, 1971.

See 91 S.Ct. 924.

Brian K. Landsberg, Civil Rights Div., Dept. of Justice, Washington, D. C., Jack Greenberg, James M. Nabrit, III, Conrad K. Harper, Norman J. Chachkin, New York City, Weldon H. Berry, Houston, Tex., for appellants.

Anthony J. P. Farris, U. S. Atty., Jerris Leonard, Asst. Atty. Gen., David L. Norman, Deputy Asst. Atty. Gen., John M. Rosenberg, David D. Gregory, Bernard H. Shapiro, Joseph B. Scott, Attys., U. S. Dept. of Justice, Washington, D. C., for the United States.

Ernest H. Cannon, W. James Kronzer, Houston, Tex., for appellees.

Before THORNBERRY, MORGAN and CLARK, Circuit Judges.

## PER CURIAM:

This school desegregation case concerns the proper method for unitizing the composition of student bodies in the schools operated by the Houston Independent School District.[1]

## DESCRIPTION

The Houston Independent School District is the sixth largest school district in the United States in terms of pupil enrollment, having approximately 235,000 students. The district meanders along, inside and outside the city limits of Houston, Texas. It contains 230 schools located on 225 campuses. With minor special exceptions, each school contains one of three basic grade structures —elementary, encompassing Kindergarten or 1st grade through 6th grade— junior high, containing grades 7 through 9—or senior high, composed of grades 10 through 12. During the 1969–70 school year the district employed 8,994 teachers, 2,882 of whom were Negroes. The student demographic information developed in this record is less than crystal clear, but the latest figures submitted by the school district, which should be the most reliable index, show a pupil enrollment of 71,961 Negroes, 157,031 whites, and 6,888 pupils whose race is unknown. The United States estimates that there are approximately 36,000 students in the system who are Spanish surnamed Americans who are statistically included within the white enumeration figures.

Typical of urban school districts nationwide, extensive patterns of racially segregated housing exist within this district. The areas of all or predominately Negro residences extend from the center of the city in a southerly direction to the county line, from the center of the city northeast to the district boundary, and in an area along and west of I-45 North. With the exception on one relatively small area in the far western portion of the district, the west half, the north central and the southeast portions of the district contain all or substantially all white residents. The only figures reflecting residential patterns for Spanish surnamed Americans are the reporting forms covering the Fall 1969 school survey required under Title VI of the Civil Rights Act of 1964. These reports show that the heaviest residential concentrations of this ethnic group are located in the north central and northeastern portion of the city. In most instances these neighborhoods are adjacent to neighborhoods which are inhabited predominantly by Negroes.

Almost the entirety of the Spring Branch and the Northeast Houston

---

1. Under the stringent requirements of Alexander v. Holmes County Board of Education, 396 U.S. 19, 90 S.Ct. 29, 24 L.Ed. 2d 19, supra, which this court has carried out in United States v. Hinds County School Board, 5 Cir., 1969, 417 F.2d 852 this court has judicially determined that the ordinary procedures for appellate review in school segregation cases have to be suitably adapted to assure that each system, whose case is before us, "begin immediately to operate as unitary school systems." Upon consideration of the record, the court has proceeded to dispose of this case as an extraordinary matter. Rule 2, FRAP.

School Districts are located within the city limits of the City of Houston but outside of the district limits of the Houston Independent School District. Substantial portions of the Cypress-Fairbanks and Pasadena School Districts are similarly located within the city but outside the school district. The district and the city are bordered by four other independent school districts—Alief, Kathy, Aldine and Galena Park; and the district, city and county adjoin school districts in Ft. Bend and Brazoria Counties. In all, there are 22 separate school districts in Harris County. The City and Houston School District limits include some separately incorporated municipalities which are served by the District.[2]

## JUDICIAL HISTORY

The district has been in litigation on matters involving racial integration at various times since December 26, 1956. Prior to court interdiction the district operated a traditional dual school system with both student bodies and faculties segregated by race into all-Negro and all-white components by means of overlapping racially segregated attendance zones. In 1960 the district court ordered implementation of a grade per year transfer plan which allowed voluntary transfers to the school maintained for the opposite race within the student's attendance zone. The desegregation process was originally scheduled to be completed in 1972.[3] In 1962 this Court reversed a district court order permitting a limited exception to the grade per year plan, which required elementary school children to attend the same school attended by their older brothers or sisters.[4] Although the timetable of additional grade coverage of the voluntary transfer plan was later accelerated, dual geographic attendance zones remained in effect under Court orders through the end of the 1966–67 school year.[5]

In 1966 a complaint was filed seeking to enjoin certain aspects of a 59,000,000 dollar school construction program on the ground that they were racially discriminatory. The complaint was dismissed and the dismissal was affirmed by this Court.[6]

On June 2, 1967, the United States was granted leave to intervene and on September 5, 1967 he district court promulgated a Jefferson County[7] type decree. Through the 1969–70 school year the district continued to be operated under this court order on a systemwide freedom of choice plan.

## PAST RESULTS

The figures as of December 1969 showed that out of 170 elementary schools in the system, 95 had student bodies with 10% or fewer Negro students while 44 schools had student bodies with 10% or fewer white students. At the junior high level school level 19 of the system's 36 schools had student bodies with 10% or fewer Negro students and 11 schools had student bodies with 10%

2. These comments as to the location of adjacent districts and governmental subdivisions are included only to demonstrate the complexity of residential and governmental boundaries to be dealt with. No point is made here of the constitutional dimensions of problems presented by racial distinctions resulting from the shape and relationship of artificial geographic boundaries of counties, municipalities and school districts. See Brunson v. Bd. of Trustees of School Dist. #1, Clarendon County, S.C., 429 F.2d 820 (4th Cir. en banc 1970).

3. Ross v. Pres. of the Bd. of Tr. of the Houston Indep. School Dist., 5 Race Rel. Rep. 703 (S.D.Tex., 1960), aff. sub nom

Houston Indep. School Dist. v. Ross, 282 F.2d 95 (5th Cir.), stay and cert. denied 364 U.S. 803, 81 S.Ct. 27, 5 L.Ed.2d 36 (1960).

4. Ross v. Dyer, 312 F.2d 191 (5th Cir. 1962).

5. See Ross v. Eckels, 11 Race Rel.Rep. 216 (S.D.Tex., 1965).

6. Broussard v. Houston Indep. School Dist., 395 F.2d 817 (5th Cir. 1968), app. dism, as moot and reh. den. 403 F.2d 34 (5th Cir. 1968).

7. United States v. Jefferson Cty. Bd. of Educ., 380 F.2d 385 (5th Cir. en banc 1967).

or fewer white students. Out of the 24 high schools in the district 12 had student bodies with 10% or fewer Negro students and 7 had student bodies with fewer than 10% white students. 77% of the Negro students in the entire system still attended schools that had student bodies composed of more than 90% Negroes.

## PROPOSALS OF THE PARTIES

Seven plans to govern student body composition were proposed to the district court.

### The Plaintiffs' Plan

The following description is taken verbatim from the district court's opinion, which the parties agree is a fair summary.

"[Plaintiffs'] plan is based upon the premise that the law requires that every school in the District shall have the same ratio of white to Negro students as prevails throughout the District. For practical purposes plaintiffs' counsel concedes that some margin must be allowed, and suggests that this margin should be no more than 10% above or below. Thus every school would have a ratio of white to Negro students ranging from 57% white—43% Negro to 77% white—23% Negro.

"Further recognizing the realities of the situation, however, the computerized plan [of plaintiffs] does not go this far, by reason of the admittedly prohibitive costs involved. The plan as submitted would result in no school having a student body in excess of 50% Negro. In light of the geographical size of the District and the residential patterns which prevail, to accomplish this result would require the daily busing of an estimated 44,000 students, approximately 34,000 white and 10,000 Negro. The plan is designed to restrict the maximum haul to a distance of 10 miles from the home of any student, and as not to overtax the capacity of any given school."

### The Stolee Plan

This plan was developed at the request of the United States by Dr. Michael J. Stolee, Director of the Florida School Desegregation Consulting Center. Because of the limitations of time and the unavailability of some pertinent facts, Dr. Stolee's ultimate recommendations were incomplete in several respects. The plan was presented more to demonstrate an approach to solving the problem rather than as a comprehensive solution. The plan included a combination of the principles of zoning, pairing and bussing. The zones were gerrymandered and pairing and bussing were utilized to increase the incidence of racial integration.

Zoning was used exclusively in senior high schools. The result was to eliminate the existing all-Negro high schools and all but one all-white high school. Except for this school, the white high school populations varied from 30 to 60%. Zoning was used with respect to junior high schools except for two which would be paired. The result was to eliminate every all-Negro junior high, but 3 all-white junior high facilities would remain. The white population of the remaining schools would vary from 50 to 70%. At the elementary level, 27 schools were to be zoned and 51 were to be paired. This required extensive bussing which was to be accomplished by having the children walk to the school nearest their home to board busses to the school they would ultimately attend. Dr. Stolee's plan did not detail how to achieve the elimination of 26 predominantly Negro elementary schools and a number of all and predominantly white elementary schools but merely made the general recommendation that additional district bussing capacity be acquired and utilized to eliminate this condition. The number of students to be bussed, transportation distances and expenses to the district do not appear in the evidence. Dr. Stolee also recommended that predominantly white Cage and predominantly Negro J. W. Jones elementary schools be closed.

### The TEDTAC Plan

The Texas Educational Desegregation Technical Assistance Center (TEDTAC) is an agency funded by the Department of Health, Education and Welfare located at the University of Texas, which offers to assist parties interested in school desegregation. In July 1969 the school board was directed by the court to seek the assistance of this agency in framing the proposals it was required to file by January 1, 1970. Some misunderstandings developed between the officials of this agency and the school district regarding consultation and cooperation in the development of the plan, with the result that the Board refused to endorse or sponsor the plan—but the government ultimately supported and urged it. It adopts the same general approach used by Dr. Stolee.

Zoning to maximize desegregation is used at all secondary school levels. TEDTAC recommended converting the Lincoln, Sharpstown and Williams Junior-Senior High School plants to Junior High Schools exclusively, and recommended that B. T. Washington Junior-Senior High School serve as a senior high school only.

A preference was stated for use of zoning at the elementary level but TEDTAC was unable to apply this technique specifically because current racially based pupil locator charts (dot maps) were not in existence and because such data as was then available was not complete. TEDTAC's secondary preference for elementary school desegregation was to use contiguous pairing of schools with emphasis upon achieving majority white schools to prevent white flight. TEDTAC also stated that cross-town bussing of elementary pupils should be used only as a last resort. However, after completion of its suggested pairing and zoning of elementary plants, 13 schools in the northeastern sector of Houston remained virtually all-Negro. The only alternative suggested to eliminate these schools was to pair them with some of the numerous remaining all-white schools in southwest Houston and to provide bussing via Loop 610 and the SW Freeway, a travel distance of approximately 16 miles. The district court found the overall results of the TEDTAC plan would be as follows:

"With respect to the high schools, there will be no all-Negro schools, and no all-white schools. there will be no high schools with less than 50 white students, and two with less than 50 Negro students. There will be no high schools with less than 100 white students, and two with less than 100 Negro students.

"With respect to the junior high schools, it appears that there will be no all-Negro junior highs; four all-white junior highs. There will be no junior highs with less than 50 white students, and 6 with less than 50 Negro students. There will be no junior highs with less than 100 white students, and 7 with less than 100 Negro students.

"With respect to the elementary schools, the results will be these. Two all-Negro elementary schools will remain, [as will] 24 all-white elementaries. There will be 6 elementary schools with less than 50 white students, and 47 with less than 50 Negro students. There will be 9 elementary schools with less than 100 white students, and 49 with less than 100 Negro students." [If cross-town bussing were eliminated the number of virtually all-Negro elementary schools would increase to 13.]

### Freedom of Choice Plan

The previous school board recommended that freedom of choice be continued. The judge rejected this plan because of the low incidence of integration it had produced, as recited above.

### Neighborhood Zoning

The 1969 school board also proposed a neighborhood zoning plan which incorporated an area contiguous to each school formed by considerations of school capacity, hazardous crossings and natural barriers. The results were that no

high school would remain all-Negro, two high schools would remain all-white; no junior high schools would be all-Negro, 5 would remain all-white; 4 of 170 elementary schools would remain all-Negro and 28 would enroll less than 50 white students, 52 elementary schools would remain all-white and 95 would have less than 50 Negro students.

### The Geographic Capacity Zoning Plan

This plan was filed and urged by the school board which took office in 1970. It is based on the plan which this court mandated and put in operation in Bibb County, Georgia in Bivins v. Bibb County Bd. of Educ., 424 F.2d 97 (5th Cir. 1970). Under this plan a zone is drawn around each school, the size of which is determined by the capacity of the school, with boundaries shaped by traffic hazards and natural physical obstacles. Every student residing within the delineated zone must attend the school in that zone. Different zones are, of course, constructed for the entire elementary system, the entire junior high school system and the entire high school system. The results of this plan as applied to Houston with respect to the 24 high schools covered are that none would remain all-Negro, 1 would remain all-white; no high school will have a Negro population exceeding 90% and only 2 will exceed 70% Negro. With respect to the 36 junior high schools, none would remain all-Negro and only 4 would remain all-white: no junior high school will have a Negro population exceeding 90%. The system would retain 170 elementary schools—4 would remain all-Negro, and an additional 25 schools would have Negro student populations exceeding 90%.

### Equidistant Zoning Plan

The 1970 school board also proposed a zoning plan which purported to follow the neighborhood school plan approved in Ellis v. Bd. of Public Instruction of Orange County, Fla., 423 F.2d 203 (5 Cir., 1970). Within each grouping of schools—high school, junior high and elementary—zone lines were first drawn by engineers exactly equidistant between the adjacent schools. Then the capacity of the school was compared with the resultant student population included in each zone. Where it was found that the capacity of the school was exceeded, adjustments were made to narrow the boundaries of the zone but in every case the change was effected in a manner which would, if possible, increase racial integration within the zone. Finally, the geometric lines as adjusted were accommodated to city street patterns to avoid bisecting individual residences. Each student would be required to attend the school in his zone at the time of enrollment and to remain in that school for the ensuing semester regardless of a later change of residence. The only exception permitted was in the instance of voluntary transfers of students from schools where their race was in the majority to other schools in which their race was in the minority, with these exceptions:

> "(a) If such student chooses the nearest school in which his race is in the minority, he is afforded automatic admission despite the capacity of the school (i. e., he is permitted to 'bump' a student of the opposite race) and he is afforded free transportation from his home;

> "(b) If such student prefers any other school in the District in which his race is in the minority, he may attend on a 'space available' basis, and if he furnishes his own transportation."

The predicted statistical results of this plan were as follows: [8]

8. The statistical summaries submitted by the various parties show some variances. We certainly agree with the district court that this was to be expected since the calculations were based upon eye count of 240,000 individual pupil locator dots, each about the size of the head of a pin. Since we are only dealing with projections and the discrepancies are slight, we do not regard this factor as crucial. However, the summaries of the parties do contain some calculations we cannot accept on the

At the high school level—

    0—all-Negro student bodies

    1—all-white student body

    1—student body in excess of 90% Negro

    10—student bodies in excess of 90% white

At the junior high school level—

    0—all-Negro student bodies

    2—all-white student bodies

    3—student bodies in excess of 90% Negro

    14—student bodies in excess of 90% white

At the elementary school level—

    4—all-Negro student bodies

    51—all-white student bodies

    23—other student bodies in excess of 90% Negro

    41—other student bodies in excess of 90% white

The overall result of the plan was to leave—

    4—all-Negro student bodies

    54—all-white student bodies

    27—other student bodies in excess of 90% Negro

    65—other student bodies in excess of 90% white

38% of all Negroes in the district would attend schools with student bodies in excess of 90% Negro, while 75% of the white students in the district would attend schools with student bodies in excess of 90% white.

## DISTRICT COURT ACTION

The district judge adopted the equidistant zoning plan. The opinion of the district court demonstrates that this case received learned, thorough, detailed consideration. The court analyzed the general geographic, student and teacher racial compositions of the Orange County, Florida, and the Houston Districts and found them to be legally comparable. It adjudicated the plan as applied in Houston to be fair and impartial in its resultant operation and that such racial segregation as did result was inherent in the city's residential patterns. In light of the other features incorporated in its order concerning teacher integration, majority to minority transfer privilege and precise faculty integration in all schools, the district court concluded that the equidistant zoning plan was a permissible means of achieving the conversion of the Houston Independent School District from a dual to a unitary system.[9]

---

basis of information available here. For example, under this plan Worthing High School is shown to have a projected enrollment of 1228 Negro students, 94 whites and 774 unknown. Since it is surrounded by other preponderantly Negro junior and elementary schools, we are unwilling to consider this school as likely to have an enrollment that will be less than 90% Negro. The same is true for Attucks Junior High School with an enrollment that is 1219 Negro, 123 white and 17 unknown; Ryan Junior High School with 1781 Negro, 93 white and 10 unknown; and Woodson Junior High School with 1426 Negro, 105 white and 96 unknown. Our totals in the 90–100% Negro range for elementary schools coincide with those calculated by the parties. All of the following figures were reached by excluding all students whose race was unknown.

9. The district court's reasoning was:
"I am of the view that the equi-distant plan will best serve the needs of the

student body, and will afford as uniformly a fair and non-discriminatory school assignment plan as well may be devised. In accepting this plan, I am mindful of the admonition contained in the *Ellis* opinion, and reiterated in Andrews v. City of Monroe, 425 F.2d 1017 (5th Cir., 1970), and in Singleton IV. [Singleton v. Jackson [Municipal Separate] School District, 426 F.2d 1364 (5th Cir., 1970)] that the *Ellis* neighborhood assignment plan is not necessarily the final answer for all large Southern school districts. It is not to be followed blindly. In my judgment, however, it not only creates a completely unitary system, but offers advantages not otherwise available.

        * * *

"It will reduce travel to a minimum. It is non-discriminatory in all but one respect, namely, where changes have been made to accommodate school capacities, they have been made in such

## APPLICABLE LEGAL STANDARDS

■ In the *Orange County* case, supra, we were careful to emphasize that, under the facts of that case, a neighborhood assignment system was adequate to convert the school from a dual to a unitary system. But in the same sentence we stated that, in the final analysis, each case had to be judged on all facts peculiar to the particular system. This is but another way of expressing what is implicit in every school decision and explicit in many in the present state of the law in this area—school cases are unique. Each school case must turn on its own facts. The rule was well stated in Allen v. Board of Public Instruction of Broward County, Florida, 5 Cir., 1970, 432 F.2d 362:

> In the conversion from dual school systems based on race to unitary school systems, the continued existence of all-black or virtually all-black schools is unacceptable where reasonable alternatives exist.

## MODIFICATIONS REQUIRED

■ The school board recommended a geographic capacity plan which the court acknowledged could have advantages over equidistant zoning.[10] At the senior and junior high school levels this plan was more effective and did in fact eliminate every all-Negro school and every school attended by more than 90% Negroes. We direct the court to adopt the portion of the geographic capacity plan applicable to these secondary schools.

On the other hand, as to the elementary schools, the equidistant neighborhood assignment plan adopted by the district court is an improvement over the geographic plan of the school board. The number of all- or virtually all-Negro student body schools under the so-called geographic assignment plan is 29 with a total of 25,848 Negro students assigned thereto. The number of such schools under the equidistant plan is 27 with a total of 21,418 students assigned thereto. Neither plan is acceptable.

---

fashion as to increase integration. Every Negro child at the high school and junior high school level will receive his education in an integrated atmosphere.

\* \* \*

"These children [in 4 remaining all-Negro schools], however, are not condemned to a segregated public school education. At worst, this condition will only continue through elementary school. At best, it may be corrected immediately, at the desire of any child so affected, who may transfer, and ride free of charge, to the nearest school in which his race is in the minority. Thus every Negro child has the opportunity for an integrated education today—the vast majority simply by attending the school nearest his home. Those elementary students who do not have it, and do not desire it today, will have it forced upon them at the junior high and high school levels. They will receive such education from a completely integrated faculty and staff.

\* \* \*

"Under this equi-distant proposal, every advantage of the neighborhood school is retained. The plan is economically and administratively sound. Additionally, the commands of *Brown I* and of *Alex-*

*ander*, supra, are fully met. In its assignment policy, the School District will be as color-blind as it is possible to be, still achieving a high degree of integration; and no child will be effectively excluded from any school because of race." 317 F.Supp. 512, 522.

10. The court's comment was as follows: "The geographic zoning plan offers an attractive solution. It offers a complete integration at both the high school and junior high school levels, and a high incidence with respect to the elementary schools. It is not unnatural for the defendant District to take cognizance in its zoning plan of natural boundaries, traffic hazards, and other such considerations. As is pointed out in Ellis, supra, however, it is the very factor of discretion in the drawing of the line which renders such a plan suspect. No matter how high the integration factor under a plan drawn without strict guidelines, the contention can always be advanced that such lines might have been drawn differently, and with a better result. In short, while I am convinced it is not the case in the present instance, whenever a School Board draws its zone lines today in a discretionary fashion, it is subject to being charged with doing so to continue the dual system."

We direct that the equidistant plan be used as a base for elementary school assignment but with the modifications hereinafter set out. These modifications which involve contiguous school zones are well within any reasonable definition of a neighborhood school system. See Mannings v. Board of Public Instruction of Hillsborough County, 5 Cir., 1970, 427 F.2d 874.

*Modifications*

Atherton .......... pair with Eliot and Scroggins
Bruce ............ pair with Anson Jones
Burrus .......... pair with Roosevelt
Crawford ........ pair with Sherman
Dodson ........... pair with Lantrip
J. W. Jones ...... pair with Fannin
N. Q. Henderson .. pair with Pugh
Pleasantville ...... pair with Port Houston
Ross ............ pair with Ryan and Looscans
Rhoads .......... pair with Frost
Sanderson ........ pair with Easter and/or Chatham
MacGregor ....... rezone with Poe to desegregate MacGregor

These pairings leave 15 all- or virtually all-Negro elementary schools: Blackshear, Clinton Park, Carnegie, Douglass, Foster, Langston, Kashmere Gardens, Pleasants, Scott, Turner, Reynolds, Sunnyside, Whidby, Concord, and Dogan. The sum of the system from the standpoint of Negro student assignment is 11,982 left in virtually all-Negro elementary schools.

The district court is directed to implement the foregoing modifications as to the elementary school zones or alternatively the court may adopt any other plan submitted by the school board or other interested parties, provided, of course, that such alternate plan achieves at least the same degree of desegregation as that reached by our modifications. See Pate v. Dade County School Board, 5 Cir., 1970, 434 F.2d 1151.

The district court also adopted a majority to minority transfer policy similar to that adopted by the Orange County Board of Education and approved by this court. Here again subsequent decisions have broadened the minimum requirements for that proviso. It must now. be modified to provide that (a) all trans-ferring students shall be given transportation if they desire it and such transportation is available from district-controlled sources, (b) transferees must be given priority for space at any school to which they wish to transfer instead of just the nearest school.[11] Allen v. Board of Public Instruction of Broward County, supra; Hightower v. West, 5 Cir., 1970, 430 F.2d 552; Carr v. Montgomery County Board of Education, 5 Cir., 1970, 429 F.2d 382; Davis v. Board of School Commissioners of Mobile, 5 Cir., 1970, 430 F.2d 883; Singleton v. Jackson Municipal Separate School District, 5 Cir., 1970, 426 F.2d 1364; Taylor v. Ouachita Parish School Board, 5 Cir., 1970, 424 F.2d 324.

The directives of the decree of the district court here on appeal relative to the other five criteria we examine in cases of this type—faculty, staff, transportation, extracurricular activities, and facilities—are correct.

The mandate in this cause shall issue forthwith; no stay will be granted pending petition for rehearing or application for writ of certiorari.

Affirmed in part, reversed in part, remanded with directions.

APPENDIX "A"

| | Plan Adopted By District Court | This Court's Modifications |
|---|---|---|
| Number of elementary schools left all- or virtually all-Negro | 27 | 15 |
| Number of Negro elementary students attending all- or virtually all-Negro schools | 20,677 | 11,982 |
| Percentage of Negroes attending all- or virtually all-Negro schools | 29% | 16% |

CLARK, Circuit Judge (dissenting):

With deference to my brothers, I must dissent. The plan selected by the district court laid down a uniform rule requiring every student in the Houston Independent School District to attend the

---

11. This priority provision, of course, applies only to transfer requests made prior to the beginning of each school term.

school closest to his home which had the physical capacity to accommodate him. I have no doubt this was and is the plan that held out the best chance to unify this school district. No one can dispute that with its majority to minority transfer rule and other complementing requirements it was a plan under which no child was effectively excluded from any school on account of race or color. Since abuse of discretion is this circuit's test for the validity of a district court's school plan, Harvest v. Bd. of Pub. Instruc. of Manatee Cty., Fla., 429 F.2d 414 (5th Cir. 1970), I believe we err when we substitute our judgment, based upon documents and maps, for that of the district court whose decision is based upon flesh and blood contact with the real people and actual problems of this district. See Carr v. Montgomery Cty. Bd. of Educ., 429 F.2d 382 (5th Cir. 1970).

Additionally, I would not reverse because the district court relied upon valid precedent still viable in this circuit, Ellis v. Bd. of Public Instruc. of Orange Cty., Fla., 423 F.2d 203 (5th Cir. 1970). The district court did not adopt the *Orange County* plan on the basis that it was some sort of talisman with universal therapeutic qualities for merging all school district student bodies. Rather, as the majority states, the trial court analyzed the general geographic and student and teacher racial compositions of the Orange County and Houston Districts and found them to be legally comparable. Yet, the majority opinion rejects the use of this plan for Houston while it in no way demonstrates an efficient legal distinction between the Houston and Orange County School Districts. Certainly the mere fact that *Orange County* denominated the requirement that a child attend the school closest to his home as a neighborhood school system, and the district court in the case *sub judice* labeled the same plan an equi-distant zoning plan, is not controlling. That is the difference between tweedledum and tweedle-

dee, which is no difference at all. Why can *Orange County* still exist as the law of this circuit applicable to that county, to Tuscaloosa and Anniston, Alabama [see Lee v. Macon County, 429 F.2d 1218 (5th Cir. 1970), and to Fulton County, Georgia, a suburb of Atlanta [see Hightower v. West, 430 F.2d 552 (5th Cir. 1970) but not in Houston, Texas? I assert it is not, as the majority suggests, because of the continued existence of all-Negro or virtually all-Negro schools. The opinion in *Orange County* expressly states that it left three schools projected to have all-Negro student bodies and it intimated that other Negro students would be attending other virtually all-Negro schools. In Fulton County, *Hightower* stated it intended to leave one school all-Negro, one school 98% Negro and two other schools in excess of 87% Negro. See also Mannings v. Bd. of Public Inst. of Hillsborough Co., Fla., 427 F.2d 874 (5th Cir. 1970).

There is only one answer. It is rapidly becoming apparent that despite express disclaimers [See Singleton v. Jackson Municipal Separate School Dist., 426 F.2d 1364 (5th Cir. 1970) [Footnote 5], the special school case panels of this circuit are now out ahead of the requirements laid down by the Supreme Court and have adopted *sub silento* some unmentionable standard of numerical pupil racial balance to govern the affirmance or reversal of school case decisions.[1] For the good of the schools and pupils of this circuit, I for one do not understand why the "magic figures" must remain a mystery enshrouded in nebulous phrasing that says that the plan adopted is "ineffective" or "unacceptable".

The true principle that underlies the reversal of the district court here is that the neighborhood school system ordered for Houston did not achieve that degree of racial balance some judges of this circuit have declared is "enough". We do nothing but delude ourselves when we adopt such a premise. Like chasing the pot of gold at the end of the rain-

1. The most recent of these opinions are collated in Allen v. Bd. of Public Instruc. of Broward Cty., 432 F.2d 362 (5th Cir. 1970).

bow, this reasoning embarks us on a course without an end. Unless someone would be boldly foolish enough to assert that courts can deprive school district patrons of their freedom, then it follows as the night follows the day that the courts will never finish litigating such "numbers game" cases.

I cannot conceive of a case more dramatically illustrative of the injustice of this rule than that presented by the case at bar. As the majority shows, there are areas within the city limits of Houston that are not included within the boundaries of the school district. Is the equal protection clause of the Constitution too impotent to reach the all-white "cut-glass" set in Spring Branch and the predominantly Negro area in Northeast Houston? Indeed, why would a document as all-pervasive as our Constitution allow the imaginary boundary lines of Pasadena or Galena Park (or even the contiguous all-white Alief or Katy districts) to thwart racial balance if that balance be constitutionally required?

Of more ominous portent is the type of partial racial balancing the majority opinion actually effects. Approximately 36,000 students in the Houston, Texas system are Spanish surnamed Americans. They have been adjudicated to be statistically white. As the majority states, we know they live in the very areas required to be paired with all or predominantly Negro schools. I say it is mock justice when we "force" the numbers by pairing disadvantaged Negro students into schools with members of this equally disadvantaged ethnic group. *See* Cisneros v. Corpus Christi Indep. School Dist., D.C.S.D.Tex., No. 68–C–95 (1970). I would be greatly surprised if a single school teacher could be found in the entire Houston Independent School District who would testify that the educational needs of either of these groups is advanced by such pairings. We seem to have forgotten that the equal protection right enforced is a right to education, not statistical integration. Why, on this kind of a theory, we could end our problems by the simple expedient of requiring that in compiling statistics every student in every school be alternately labeled white and Negro! Then, you see, everything would come out 50–50 and could get our seal of approval once and for all.

My views have not changed from those expressed by the dissents filed by Judge Coleman and myself in Singleton v. Jackson Municipal Separate School Dist., 425 F.2d 1211 (5th Cir. En Banc 1970). We still haven't given any affirmative help to school districts and trial courts. Surely the actual practical definition of a unitary school system should no longer be kept secret. Now is the time for this court to play "show and tell", while we still have viable school systems left to which we may apply our definition.

It also bears repeating that this district is not to blame. The Houston Independent School District has been under the injunctive mandate of the federal courts for more than the past ten years and has never been shown to have violated our orders. Thus the fault to be fixed for any shortcomings of the district today squarely belongs to the federal courts and not the district, its staff or patrons.

The law in this field is entirely empirical. All must admit we are just beginning experimentations to find our way along an obscure path to the constitutional goal of a unitary school system—one in which no child shall be effectively excluded from any school on account of race or color. I predict that we shall soon discover in this as in other experimentation that a basic rule holds which requires ingredients and methods to be introduced singly, not in groups or bunches, lest the experiment continuously fail because one new departure cancelled out the benefits that came from another.

We should ever be mindful that the term "school case" is merely a fasciate for the collective bundle of separate rights belonging to the individual children, parents, teachers and related community lives and activities that compose

the sheaf which is a school district. If we prove nothing else, we will prove that the courts are totally inadequate as an institution to deal with such numerous and complex interrelationships of rights on a comprehensive basis. We delude ourselves when we attempt to adjust the rights of hundreds of thousands of citizens by remote control. In any event, we ought to give those basic corrections we have already made, such as teacher racial balance, majority to minority transfer privileges, biracial committees and open housing and private employment discrimination decisions, a chance to function before we attempt to mandate student racial balancing.

Resignation to my fate as a dissenter cannot overcome my remorse for those whose rights our edicts trample in wholesale lots. I respectfully dissent.